**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

JENNIE LINN MCCORMACK,
            *Plaintiff-Appellee,*

v.

MARK L. HIEDEMAN, Bannock
County Prosecuting Attorney,
            *Defendant-Appellant.*

No. 11-36010

D.C. No.
4:11-cv-00433-BLW

JENNIE LINN MCCORMACK,
            *Plaintiff-Appellant,*

v.

MARK L. HIEDEMAN, Bannock
County Prosecuting Attorney,
            *Defendant-Appellee.*

No. 11-36015

D.C. No.
4:11-cv-00433-BLW

OPINION

Appeal from the United States District Court
for the District of Idaho
B. Lynn Winmill, Chief District Judge, Presiding

Argued and Submitted
July 9, 2012—Portland, Oregon

Filed September 11, 2012

10913

Before: Betty B. Fletcher and Harry Pregerson,
Circuit Judges, and Donald E. Walter,
Senior District Judge.*

Opinion by Judge Pregerson

---

*The Honorable Donald E. Walter, Senior District Judge for the U.S.
District Court for the Western District of Louisiana, sitting by designation.

## COUNSEL

Clay R. Smith, Deputy Attorney General, Boise, Idaho, for the defendant-appellant and cross-appellee.

Richard A. Hearn, Racine, Olson, Nye, Budge & Bailey, Chartered, Pocatello, Idaho, for the plaintiff-appellee and cross-appellant.

Kathleen M. O'Sullivan, Perkins Coie, Seattle, Washington, for amici curiae Legal Voice, Center for Reproductive Rights, and National Advocates for Pregnant Women.

## OPINION

PREGERSON, Circuit Judge:

On May 18, 2011, Mark Hiedeman, the Bannock County, Idaho prosecuting attorney, filed a felony criminal complaint in the district court of the State of Idaho, in and for Bannock County against Jennie Linn McCormack. The complaint charged McCormack with "the public offense of Unlawful Abortion, Idaho Code § 18-606," which makes it a felony for any woman to undergo an abortion in a manner not authorized by statute. As a result, McCormack faced the possibility of up to five years imprisonment for allegedly violating Idaho Code § 18-606, which specifically targets pregnant women. Idaho Code § 18-606(2). On September 7, 2011, the Idaho state district court dismissed the criminal complaint without prejudice. Prosecuting attorney Hiedeman has not determined whether he will re-file the criminal complaint.

On September 24, 2011, McCormack filed in the U.S. District Court for the District of Idaho a class action lawsuit against the prosecuting attorney, Hiedeman. The suit charges, among other things, that Idaho Code § 18-606 violates various provisions of the United States Constitution. The district court issued a preliminary injunction, restraining Hiedeman from enforcing Idaho Code §§ 18-606 and 18-608(1). Hiedeman appeals, arguing that (1) the federal district court erred in determining that McCormack would likely succeed on the merits; and (2) the injunction is overbroad. McCormack cross appeals, arguing that the federal district court should have enjoined enforcement of Idaho Code § 18-606 in conjunction with both §§ 18-608(1) and 18-608(2). Additionally, McCormack argues that she has standing to challenge the enforcement of Chapter 5, the Pain-Capable Unborn Child Protection Act (including Idaho Code §§ 18-505 – 18-507).

For the reasons set forth below, we affirm in part and reverse in part the district court's grant of a preliminary injunction.

## A. Background

McCormack is a resident of Bannock County, Idaho. In 2010, McCormack was unmarried, had three children (ages 2, 11, and 18), and was unemployed. In 2010, McCormack had no source of income other than child support payments which were between $200 and $250 per month.

In the fall of 2010, McCormack was pregnant and sought an abortion. She knew that abortions were not available in southeast Idaho. In fact, there are no licensed health care providers offering abortion services in the eight southeastern Idaho counties. McCormack knew that abortions are available in Salt Lake City, Utah, but at costs between $400 – $2,000 depending on how far along the pregnancy is.[1]

But McCormack found out that abortions could be performed in Idaho using medications, rather than surgery and that the cost of such medical abortions was significantly less than the cost of a surgical abortion like those offered in Salt Lake City, Utah. She further learned that medications inducing abortions had been approved for use in the U.S. and could be purchased over the internet.

In McCormack's complaint, she states that she "considered terminating her pregnancy . . . by ingesting one or more medications she reasonably believed to have been prescribed by a health care provider practicing outside Bannock County, Idaho." During the hearing before the district court on McCormack's motion for a preliminary injunction, McCormack's attorney reiterated that the medications were pre-

---

[1] It is about 138 miles from Bannock County, Idaho to Salt Lake City, Utah. This Court takes "judicial notice of a Google map and satellite image as a 'source[ ] whose accuracy cannot reasonably be questioned,' " at least for determining the approximate distance from Idaho to Utah. *See United States v. Perea-Rey*, 680 F.3d 1179, 1182 n.1 (9th Cir. 2012) (quoting Fed. R. Evid. 201(b)).

scribed by a physician. McCormack's attorney stated that McCormack went to "a provider over the [i]nternet."

On May 18, 2011, Hiedeman, in his capacity as Bannock County prosecuting attorney, filed a criminal complaint in the district court of the State of Idaho, in and for Bannock County, charging McCormack with the felony of "the public offense of Unlawful Abortion, Idaho Code § 18-606." The criminal complaint alleged:

> That the said JENNIE LINN MCCORMACK, in the County of Bannock, State of Idaho, on the 24th day of December, 2010, did induce or knowingly aid in the production or performance of an abortion by knowingly submitting to an abortion and/or soliciting of another, for herself, the production of an abortion; and/or who purposely terminated her own pregnancy other than by live birth.[2]

A magistrate judge dismissed the criminal complaint without prejudice on September 7, 2011. Hiedeman has not determined whether to re-file the criminal complaint.

McCormack does not want to have additional children. If she became pregnant, she would seek an abortion again. Because there are no providers of medical abortions in southeast Idaho, McCormack would need to seek the assistance of providers of abortion services outside of southeast Idaho.

### B.   Statutes

This case requires the interpretation of three Idaho abortion statutes: Idaho Code § 18-606, Idaho Code § 18-608, and

---

[2]The criminal complaint does not allege which trimester McCormack was in when she had the alleged abortion. It also does not state the estimated age of the aborted fetus. Further, it does not specify which statute in conjunction with § 18-606 the state was prosecuting McCormack under.

Idaho Code § 18-505. We summarize the substance of each statute.

### 1. Chapter Six: Idaho Code § 18-606

Idaho Code § 18-606(2) makes it a felony, except as permitted by the remainder of Title 8, Chapter 6 of the Idaho Code, for "[e]very woman who knowingly submits to an abortion or solicits of another, for herself, the production of an abortion, or who purposely terminates her own pregnancy otherwise than by a live birth . . . ." Anyone deemed guilty of violating § 18-606 "shall be fined not to exceed five thousand dollars ($5,000) and/or imprisoned in the state prison for not less than one (1) and not more than five (5) years." Idaho Code § 18-606(2).

### 2. Chapter Six: Idaho Code § 18-608

Idaho Code § 18-608, entitled "Certain abortions permitted — Conditions and guidelines" provides the statutory content for the limitation on the applicability of Idaho Code § 18-606.

Under § 18-608(1), a woman may terminate her pregnancy during the first trimester if the abortion is performed by a physician

> in a hospital or in a physician's regular office or a clinic which office or clinic is properly staffed and equipped for the performance of such procedures and respecting which the responsible physician or physicians have made satisfactory arrangements with one or more acute care hospitals within reasonable proximity thereof providing for the prompt availability of hospital care as may be required due to complications or emergencies that might arise.

Under § 18-608(2), a woman may terminate her pregnancy during the second trimester of pregnancy, but the abortion

must be "performed in a hospital and [must be], in the judgment of the attending physician, in the best medical interest of such pregnant woman."

### 3. Chapter Five, the Pain-Capable Unborn Child Protection Act: Idaho Code § 18-505 – § 18-507

Idaho Code § 18-505, or the Pain-Capable Unborn Child Protection Act ("PUCPA"), categorically bans non-therapeutic abortions at and after twenty weeks. "Any person who intentionally or recklessly performs or attempts to perform an abortion in violation of the provisions of section 18-505, Idaho Code, is guilty of a felony." Idaho Code § 18-507. The Act further states "No penalty shall be assessed against the woman upon whom the abortion is performed or attempted to be performed." *Id.*

The Act also provides civil remedies in the form of actual damages to "[a]ny woman upon whom an abortion has been performed in violation of the pain-capable unborn child protection act or the father of the unborn child . . . ." Idaho Code § 18-508(1). The Act also permits certain persons, including a prosecuting attorney, to file an action for injunctive relief against an abortion provider who violates § 18-505. Idaho Code § 18-508(2).

### C. Procedural History

On September 16, 2011, McCormack filed her class action complaint against Defendant Mark L. Hiedeman, in his capacity as Bannock County prosecuting attorney. As part of her complaint, she sought declaratory relief, and preliminary and permanent injunctive relief.

McCormack simultaneously filed a request for a temporary restraining order under Fed. R. Civ. P. 65(b). The parties stipulated to the entry of the temporary restraining order, and the district court approved the stipulation on October 7, 2011,

consistent with the memorandum decision entered on September 23, 2011. The temporary restraining order expired on October 21, 2011. On November 14, 2011, the district court issued a preliminary injunction that enjoined Hiedeman "from enforcing Idaho Code §§ 18-606 and 18-608(1) for those reasons and on those grounds set forth in the Memorandum Decision and Order entered on September 23, 2011." Hiedeman filed a timely notice of appeal and McCormack cross-appealed.

In this case, Hiedeman asserts that (1) the district court applied the incorrect legal standard for granting a preliminary injunction, and (2) based its decision on clearly erroneous facts. Additionally, Hiedeman asserts that the preliminary injunction is overbroad to the extent that it grants relief beyond McCormack. In her cross-appeal, McCormack contends that the district court should have enjoined enforcement of Idaho Code § 18-606 in conjunction with both §§ 18-608(1) *and 18-608(2).* Additionally, McCormack asserts that she has standing to challenge the enforcement of Chapter 5, the Pain-Capable Unborn Child Protection Act (including Idaho Code §§ 18-505 – 18-507).

## JURISDICTION

This court has jurisdiction pursuant to 28 U.S.C. § 1292(a)(1).

## STANDARD OF REVIEW

We review the district court's grant of a preliminary injunction for abuse of discretion. *Am. Trucking Ass'ns, Inc. v. City of Los Angeles*, 559 F.3d 1046, 1052 (9th Cir. 2009). A district court abuses its discretion if it bases its decision on an erroneous legal standard or clearly erroneous findings of fact. *Sierra Forest Legacy v. Rey*, 577 F.3d 1015, 1021 (9th Cir. 2009) (citation omitted). Application of an incorrect legal standard for preliminary relief or with regard to the underly-

ing issues in the case are grounds for reversal. *See Earth Island Inst. v. U.S. Forest Serv.*, 351 F.3d 1291, 1298 (9th Cir. 2003); *Sports Form, Inc. v. United Press Int'l, Inc.*, 686 F.2d 750, 752 (9th Cir. 1982). The district court's interpretation of underlying legal principles is subject to de novo review. *Sw. Voter Reg. Educ. Project v. Shelley*, 344 F.3d 914, 918 (9th Cir. 2003).

## DISCUSSION

### I. The district court did not abuse its discretion in determining that McCormack would likely succeed with her facial constitutional challenges to Idaho Code §§ 18-606 and 18-608(1).

"A plaintiff seeking a preliminary injunction must establish that [s]he is likely to succeed on the merits, that [s]he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [her] favor, and that an injunction is in the public interest." *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 20 (2008).

This case turns on the first factor—whether McCormack established that she was likely to succeed on the merits. Hiedeman contends that the U.S. District Court's conclusion concerning the probability of success is based on incorrect legal analysis and unsupported factual determinations. Hiedeman is wrong on both counts.

### 1. The U.S. District Court did not employ an erroneous legal standard.

The district court rested its decision to grant the preliminary injunction on the "undue burden test" set out in *Planned Parenthood v. Casey*, 505 U.S. 833 (1992). Prosecuting attorney Hiedeman does not argue that the U.S. District Court's use of *Casey* is an erroneous legal standard. Instead, Hiedeman argues that "[t]he rationale for [abortion] statutes — the

woman's health and safety — applies with no less force where the woman rather than another person performs the abortion." Thus, he argues that the U.S. District Court erred in determining that McCormack was likely to succeed on the merits. We disagree.

### a. History of Abortion Statutes.

Historically, laws regulating abortion have sought to further the state's interest in protecting the health and welfare of pregnant women, who alone bear the burden and risks of pregnancies. With this interest in mind, abortion statutes were first enacted to protect pregnant females from third parties providing dangerous abortions. *See Roe v. Wade*, 410 U.S. 113, 151 (1973) (recognizing that, the purpose of abortion "laws in the late 19th and early 20th centuries did focus on the State's interest in protecting the woman's health rather than in preserving the embryo and fetus."); *Abele v. Markle*, 342 F. Supp. 800, 806 (D.C. Conn. 1972) ("abortions performed before [1867], even under the best of then known medical practices, created grave risks for the health and life of the mother. There can be no doubt that this was an evil known to and appreciated by the Nineteenth Century legislators."); *State v. Ashley*, 701 So. 2d 338, 340 (Fla. 1997) ("At common law, while a third party could be held criminally liable for causing injury or death to a fetus, the pregnant woman could not be." (citing *State v. Carey*, 76 Conn. 342 (1904) (differentiating between those actions by a third party and those taken upon oneself))).

As a result, abortion statutes have traditionally criminalized the behavior of third parties to protect the health of pregnant women. *See id.* As one court noted:

> The obvious purpose [of the abortion statute enacted in 1846] was to protect the pregnant woman. When one remembers that the passing of the statute predated the advent of antiseptic surgery, the Legisla-

ture's wisdom in making criminal any invasion of the woman's person, save when necessary to preserve her life, is unchallengeable.

*People v. Nixon*, 201 N.W. 2d 635, 639 (Mich. App. 1972); *see also Gaines v. Wolcott*, 167 S.E. 2d 366, 370 (Ga. App. 1969) (recognizing that, "the appalling, unsanitary and unprofessional conditions under which . . . illegal operations are in fact performed warrant the protection of the law to women.").

**[1]** Most modern state criminal statutes continue to apply criminal liability to third parties who perform abortion in a manner not proscribed by the statute. These statutes, known as physician-only statutes, impose criminal liability on anyone other than a licensed physician from performing abortions. But many of these same criminal statutes expressly exempt women from criminal liability for obtaining an abortion and do not hold them liable for actions or inactions that affect their pregnancy outcomes.[3] When state statutes do not

---

[3]*See e.g.*, Alaska Stat. § 11.41.289 (liability for "assault of an unborn child" does not apply to actions "committed by a pregnant woman against herself and her own unborn child"); Ark. Code Ann. §§ 5-61-101(c), 5-61-102(c) ("Nothing in this section shall be construed to allow the charging or conviction of a woman with any criminal offense in the death of her own unborn child in utero"); Fla. Stat. § 782.36 ("A patient receiving a partial-birth-abortion procedure may not be prosecuted under this act."); 720 Ill. Comp. Stat. 5/9-1.2(b) (criminal liability for intentional homicide of an unborn child does not apply to "the pregnant woman whose unborn child is killed"); Kan. Stat. Ann. § 65-6703(e) ("A woman upon whom an abortion is performed shall not be prosecuted under this section . . . ."); Ky. Rev. Stat. Ann. § 507A.010(3) ("nothing in this chapter shall apply to any acts of a pregnant woman that caused the death of her unborn child"); La. Rev. Stat. Ann. § 14:87A.(2) (penalties for criminalized abortions not applicable to pregnant women having abortions); Minn. Stat. § 609.266 (excluding the "pregnant woman" from liability for "crimes against unborn children"); Neb. Rev. Stat. § 28-335 (providing "[n]o civil or criminal penalty . . . against the patient upon whom the abortion is performed"); Ohio Rev. Code Ann. § 2919.17(I)(expressly excluding women from liability for post-viability abortions); 18 Pa. Cons. Stat. Ann. § 2608

expressly exempt pregnant women, state courts interpreting them have concluded that pregnant women are exempt from criminal prosecution.[4]

> b.   *The Supreme Court has not authorized the criminal prosecution of women for seeking abortion care.*

**[2]** Consistent with this history, there is no Supreme Court precedent that recognizes or suggests that third party criminal liability may extend to pregnant women who obtain an abortion in a manner inconsistent with state abortion statutes. Nevertheless, prosecuting attorney Hiedeman asserts that under

---

(exempting pregnant women from liability "in regards to crimes against her unborn child"); Tex. Penal Code Ann. § 19.06(1) (exempting the woman from liability for "death of an unborn child"); Utah Code Ann. § 76-7-314.5(2) ("A woman is not criminally liable for (a) seeking to obtain, or obtaining, an abortion that is permitted by this part; or (b) a physician's failure to comply [with specified statutes.]"); Vt. Stat. Ann. tit. 13 § 101 ("However, the woman whose miscarriage is caused or attempted shall not be liable to the penalties prescribed by this section."); Wis. Stat. Ann. § 940.13 (providing no fine or imprisonment for a woman who obtains an abortion or violates any provision of an abortion statute).

[4] *See e.g.*, *State v. Ashley*, 701 So. 2d 338, 340 (Fla. 1997) (holding that a woman possessed immunity from criminal prosecution "for causing injury or death to [her] fetus"); *State v. Aiwohi*, 123 P.3d 1210, 1224 (Haw. 2005) (holding that, the definition of "person" in the Hawaii manslaughter statute did not include a fetus, and thus did not apply when a woman caused the death of her fetus by smoking crystal methamphetamine); *Hillman v. State*, 503 S.E. 2d 610, 611 (Ga. App. 1998) (holding that the Georgia criminal abortion statute does not criminalize a pregnant woman's actions in securing an abortion, regardless of the means used); *State v. Barnett*, 437 P.2d 821, 822 (Or. 1968) (recognizing that a reading of the Oregon criminal statute "indicates that the acts prohibited are those which are performed upon the mother rather than any action taken by her"). Although these cases generally find that a woman cannot be held criminally liable, their decisions rest primarily on the state court's interpretation of state criminal law, and they did not involve an "undue burden" analysis.

current precedent physician-only provisions in abortion statutes can be applied with equal force to pregnant women who fail to comply with state abortion statutes. He argues that "[a] State . . . has an interest in strict adherence to physician-only requirements and need not, as a constitutional matter, carve out an enforcement exception for women who take it upon themselves to self-abort." Prosecuting attorney Hiedeman mistakenly relies on *Roe*, 410 U.S. 113, *Casey*, 505 U.S. 833, *Connecticut v. Menillo*, 423 U.S. 9 (1975) (per curiam), and *Mazurek v. Armstrong*, 520 U.S. 968 (1997) (per curiam), to argue that the Supreme Court has decided this issue, and thus, McCormack is not likely to succeed on her claims.

First, Hiedeman asserts that under *Roe*, a state may constitutionally prohibit anyone other than a licensed physician from performing an abortion. In *Roe*, the Supreme Court recognized that the right to personal privacy under the Due Process Clause of the Fourteenth Amendment is broad enough to encompass a woman's decision to have an abortion. 410 U.S. at 153-54. *Roe* recognized, however, that there are some limitations to this right because that right must be balanced against the state's important and legitimate interest in protecting prenatal life and protecting women's health. *Id.* at 162. Hiedeman cites the following passage from *Roe* to support his argument that McCormack can be held criminally liable for failing to comply with Idaho's abortion statutes:

> The State has a legitimate interest in seeing to it that abortion, like any other medical procedure, is performed *under circumstances that insure maximum safety for the patient.* This interest obviously extends at least to the performing physician and his staff, to the facilities involved, to the availability of aftercare, and to adequate provision for any complication or emergency that might arise.

*Id.* at 150 (emphasis added). Further, Hiedeman notes that *Roe* held that "[t]he State may define the term 'physician' . . .

to mean only a physician currently licensed by the State, and may proscribe any abortion by a person who is not a physician as so defined." *Id.* at 165. Hiedeman further argues that *Casey* did not disturb this long-standing Supreme Court precedent. 505 U.S. at 856 (recognizing "the right of the woman to choose to have an abortion before viability and to obtain it without interference from the State," but noting that, "[a]ll abortion regulations interfere to some degree with a woman's ability to decide whether to terminate her pregnancy," thus the constitutionally critical concern is whether the regulations "in [a] real sense deprive[ ] women of the ultimate decision").

Hiedeman's attempt to equate these Supreme Court principles with the Idaho statute at issue in this case is unpersuasive. These principles, embraced by the Supreme Court, recognize that women's health is an important interest for the state and one that is considered in crafting abortion statutes. These principles, however, in no way recognize, permit, or stand for the proposition that a state may prosecute a pregnant woman who seeks an abortion in a manner that may not be authorized by the state's statute, including when a pregnant woman receives physician- prescribed medication to terminate her pregnancy. Hiedeman's reading of Roe and *Casey* expands these Supreme Court holdings to reach an unintended result.

Hiedeman's reliance on *Connecticut v. Menillo* is equally unpersuasive. In *Menillo*, the Supreme Court reinstated the conviction of Patrick Menillo for attempting to procure an abortion. *Menillo*, 423 U.S. at 9. "Menillo, a nonphysician with no medical training, performed an abortion upon a female in normal good health for a $400 fee." *State v. Menillo*, 368 A.2d 136, 137 (Conn. 1976). A jury found Menillo guilty under a Connecticut statute, which prescribes that "any person who gives or administers to any woman, or advises or causes her to take or use anything . . . , with the intent to procure upon her a miscarriage or abortion, unless the same is necessary to preserve her life or that of her unborn

child, shall be fined . . . or imprisoned." *Menillo*, 423 U.S. at 10 n.1. The Connecticut Supreme Court overturned Menillo's conviction, holding that the statute was "null and void" under federal law. *Id.* at 9. The U.S. Supreme Court vacated and reinstated Menillo's conviction. *Id.* The U.S. Supreme Court stated that *Roe* supported the "continued enforceablity of criminal abortion statutes against nonphysicians." *Id.* at 10. The Court explained:

> *Roe* teaches that a State cannot restrict a decision by a woman, with the advice of her physician, to terminate her pregnancy during the first trimester because neither its interest in maternal health nor its interest in the potential life of the fetus is sufficiently great at that stage. But the insufficiency of the State's interest in maternal health is predicated upon the first trimester abortion's being as safe for the woman as normal childbirth at term, and that predicate holds true only if the abortion is performed by medically competent personnel under conditions insuring maximum safety for the woman. . . . Even during the first trimester of the pregnancy, therefore, prosecutions for abortions conducted by nonphysicians infringe upon no realm of personal privacy secured by the Constitution against state interference.

*Id.* at 10-11.

Like *Roe*, *Menillo* also does not discuss the issue presented here: whether the state can impose criminal liability on pregnant women for failing to abide by the state's abortion statutes. *Menillo* does not uphold the prosecution of pregnant women who undergo abortions in a manner not prescribed by statute. The statute at issue in *Menillo* was directed only against the person who commits or attempts to commit the act on the pregnant woman (i.e., it criminalized the actions of a third party—a nonphysician). *See id.* at 10 n.1 ("Any person who gives or administers *to* any woman . . . .") (emphasis

added). Thus, *Menillo* stands for the unremarkable proposition that states may prosecute unlicensed providers of unsafe, "back-alley" abortions.

Prosecuting attorney Hiedeman also erroneously relies on the more recent case of *Mazurek v. Armstrong*, 520 U.S. 968 (1997) (per curiam). The Montana statute at issue in *Mazurek* was aimed at stopping a physician assistant, who had legally provided abortion services under the supervision of a physician, from continuing to provide that care. *Armstrong v. Mazurek*, 94 F.3d 566, 566-67 (9th Cir. 1996). This court, relying on *Casey*, held that the appellants in *Mazurek* had demonstrated a "fair chance of success on the merits." *Id.* at 568. The question before the Supreme Court in *Mazurek* was whether a state could bar *medical professionals* other than physicians from providing abortion services. *Mazurek v. Armstrong*, 520 U.S. 968, 969-72 (1997). *Mazurek* did not involve an attempt to prosecute a woman for seeking a pre-viability abortion. Consequently, like Hiedeman's reliance on *Menillo*, Hiedeman's reliance on *Mazurek* is unavailing.

**[3]** Here, Idaho Code § 18-606(2) explicitly makes it a felony, for "[e]very woman who knowingly submits to an abortion or solicits of another, for herself, the production of an abortion, or who purposely terminates her own pregnancy otherwise than by live birth" in a manner inconsistent with Idaho's abortion statutes. Idaho Code § 18-606(2), which criminalizes the conduct of pregnant women—as opposed to the conduct of a third-party performing the abortion—is, as described above, different from any matter the U.S. Supreme Court or this court has considered since *Roe* was handed down. For the reasons explained below, it is likely that McCormack will succeed on the merits because § 18-606(2) imposes an undue burden on a woman's ability to terminate her pregnancy.

### c. The district court did not err in determining that McCormack is likely to succeed on the merits.

The district court concluded that under *Casey*'s "undue burden" test, McCormack established "that Idaho Code § 18-606 places an undue burden on women's decision to choose a pre-viability abortion[5] because it[ ] subjects women seeking abortions in Idaho to criminal prosecution if those women fail to ensure that their abortion providers comply with the requirements of Idaho Code § 18-608." We agree with the district court that at this stage, Idaho Code § 18-606 places an undue burden on women's decision to terminate a pre-viability pregnancy.

Although women have a Fourteenth Amendment right to terminate a pre-viability pregnancy, that right has some limitations. *See Casey*, 505 U.S. at 895. Women challenging an abortion statute must demonstrate that the challenged abortion statute places an "undue burden" on a woman's ability to decide whether to terminate her pregnancy. *Id.* at 874. "A finding of undue burden is a shorthand for the conclusion that a state regulation has the purpose or effect of placing a sub-

---

[5]*Casey* recognized "the right of the woman to choose to have an abortion before viability and to obtain it without interference from the State." 505 U.S. at 846. Viability, according to *Roe*, "is usually placed at about seven months (28 weeks) but may occur earlier, even at 24 weeks." *Roe*, 410 U.S. at 160. Viability is a critical stage in a pregnancy because it is at that time that "the fetus then presumably has the capability of meaningful life outside the mother's womb." *Id.* at 163. Subsequent to *Roe*, the Court in *Planned Parenthood of Central Missouri v. Danforth,* 428 U.S. 52, 63-64 (1976), affirmed that view but clarified that viability is "flexib-[le]" and ultimately a "matter of medical judgment, skill, and technical ability." This is because the "time when viability is achieved may vary with each pregnancy," and thus, a "determination of whether a particular fetus is viable is, and must be, a matter for the judgment of the responsible attending physician." *Id.* at 64. Thus, it is "not the proper function of the legislature or the courts to place viability . . . at a specific point in the gestation period." *Id.*

stantial obstacle in the path of a woman seeking an abortion of a nonviable fetus." *Id.* at 877.

**[4]** Under *Casey*, the challenged Idaho abortion statute, § 18-606, constitutes a substantial obstacle in the path of women seeking an abortion of a nonviable fetus. Under Idaho Code § 18-606, "[e]very woman who knowingly submits to an abortion or solicits of another, for herself, the production of an abortion, or who purposely terminates her own pregnancy otherwise than by a live birth" is subject to felony charges, unless the abortion was performed as permitted by the remainder of Title 8, Chapter 6 of the Idaho Code, including Idaho Code § 18-604 through 18-615. A pregnant woman who violates this statute is subject to the possibility of up to five years imprisonment. Idaho Code § 18-606(2). The remainder of Chapter 6 details the manner in which a woman in Idaho may obtain a lawful abortion.[6]

**[5]** Chapter 6 puts an undue burden on women seeking abortions by requiring them to police their provider's compliance with Idaho's regulations. If a woman terminates her pregnancy during the first trimester but fails to ask the physician whether the office has made "satisfactory arrangements with one or more acute care hospitals within reasonable prox-

---

[6]Under § 18-608(1), a woman may terminate her pregnancy during the first trimester if and when the abortion is performed by a physician

> in a hospital or in a physician's regular office or a clinic which office or clinic is properly staffed and equipped for the performance of such procedures and respecting which the responsible physician or physicians have made satisfactory arrangements with one or more acute care hospitals within reasonable proximity thereof providing for the prompt availability of hospital care as may be required due to complications or emergencies that might arise.

Under § 18-608(2), a woman may terminate her pregnancy during the second trimester of pregnancy, but it must be "performed in a hospital and is, in the judgment of the attending physician, in the best medical interest of such pregnant woman."

imity thereof providing for the prompt availability of hospital care as may be required due to complications or emergencies that might arise," she would be subject to a felony charge if the physician has not made such arrangements. Idaho Code § 18-608(1). If a woman finds a doctor who provides abortions during the second trimester of a woman's pregnancy, but the doctor fails to tell the pregnant woman that the abortion will be performed in a clinic as opposed to a hospital, the pregnant woman would be subject to felony charges. Idaho Code § 18-608(2). Or, as is the case here, if a woman elects to take physician prescribed pills obtained over the internet to end her pregnancy, which is not authorized by statute, she is subject to felony charges. Idaho Code §§ 18-608(1)-18-608(3).

There can be no doubt that requiring women to explore the intricacies of state abortion statutes to ensure that they and their provider act within the Idaho abortion statute framework, results in an "undue burden" on a woman seeking an abortion of a nonviable fetus.[7] Under this Idaho statute, a pregnant woman in McCormack's position has three options: (1) carefully read the Idaho abortion statutes to ensure that she and her provider are in compliance with the Idaho laws to avoid felony prosecution; (2) violate the law either knowingly or unknowingly in an attempt to obtain an abortion; or (3) refrain altogether from exercising her right to choose an abortion.

---

[7]Because McCormack has established that she will likely succeed on the merits, we do not discuss whether "there is a serious question going to the merits." *Alliance for Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011). As simply a reconfiguration of the four-element test in *Winter*, 555 U.S. at 20, the "sliding scale" approach to preliminary injunctions remains valid: " 'A preliminary injunction is appropriate when a plaintiff . . . demonstrates that serious questions going to the merits were raised and the balance of hardships tips sharply in the plaintiff's favor.' " *Alliance for Wild Rockies*, 632 F.3d at 1134-35 (quoting *Lands Council v. McNair*, 537 F.3d 981, 986 (9th Cir. 2008) (en banc)). Given that McCormack has demonstrated a likelihood of success on the merits, McCormack would also succeed under this lesser standard.

This Idaho statute heaps yet another substantial obstacle in the already overburdened path that McCormack and pregnant women like her face when deciding whether to obtain an abortion. For many women, the decision whether to have an abortion is a difficult one involving the consideration of weighty ethical, moral, financial, and other considerations.[8] *Gonzales v. Carhart*, 550 U.S. 124, 184 n.7 (2007) (Ginsburg, J., dissenting); *see also* Thomas D. Kerenyi et al., *Reasons for Delayed Abortion: Results of Four Hundred Interviews*, 117 Am. J. of Obstetrics & Gynecology 299 (1973). Among other things, women must contemplate whether they are ready for a child or another child, including considering whether that child conforms with plans for future education and career goals. Lawrence B. Finer et al., *Reasons U.S. Women Have Abortions: Quantitative and Qualitative Perspectives*, 37 Persp. on Sexual and Reprod. Health 110, 113 (2005) (noting that a quarter of women cite that they are not ready for a child or another child as one of the most important reasons for not having a child). Additionally, women often take into account the perspective of their family members. *See* Aida Torres &

---

[8]The mental anguish discussed here should not be confused with the mental health issues that allegedly arise after a woman has an abortion. Numerous medical studies have denounced any link between having an abortion and later mental illnesses. *See Carhart*, 550 U.S. at 184 n. 7 (Ginsburg, J., dissenting) (noting " 'neither the weight of the scientific evidence to date nor the observable reality of 33 years of legal abortion in the United States comports with the idea that having an abortion is any more dangerous to a woman's long-term mental health than delivering and parenting a child that she did not intend to have' " (quoting Susan A. Cohen, *Abortion and Mental Health: Myths and Realities*, 9 Guttmacher Policy Rev. 8 (2006))); *see also* Nancy E.Adler et al., Psychological Responses After Abortion, 248 Sci. 41 (1990); American Psychological Association, Report of the APA Task Force on Mental Health and Abortion 4 (2008), *available at* http://www.apa.org/pi/women/programs/abortion/mental-health.pdf (concluding that "[t]he best scientific evidence published indicates that among adult women who have an unplanned pregnancy the relative risk of mental health problems is no greater if they have a single elective first-trimester abortion than if they deliver that pregnancy") (emphasis omitted).

Jacqueline D. Forrest, *Why do Women Have Abortions?*, 20 Fam. Plan. Persp. 169, 176 (1988) (concluding that more than 20 percent of women "chose to have an abortion at least in part because their husband or partner wanted them to" and more than 25 percent of minors were influenced by their parents' wishes).

Further, McCormack and other women in her position, have to grapple with the cost of the abortion itself as well as the long-term financial implications of not having one. *See* U.S. Dep't of Agric., Expenditures on Children by Families, at iv (2012) (finding that for a two-child, husband-wife family, annual expenses ranged from $8,760 to $9,970, on average for households with before tax income less than $59,410 and that the financial cost of having a child "generally increase[s] with the age of the child"). Because they do not have the financial wherewithal to confirm suspected pregnancies, low-income women are often forced to wait until later in their pregnancies to obtain an abortion. Lawrence B. Finer et al., *Timing of Steps and Reasons for Delays in Obtaining Abortions in the United States*, 74 Contraception 334, 343 (2006) (hereinafter *Timing of Steps*) (finding "[l]ower-income women typically take more time to confirm a suspected pregnancy, which could relate to the cost of a home pregnancy test and the difficulty in getting a test from a clinic or a doctor."); *see also* Diana G. Foster et al., *Predictors of Delay in Each Step Leading to an Abortion*, 77 Contraception 289, 292 (2008) (finding that many women report being delayed by financial factors). Delayed confirmation compounds the financial difficulties, as the cost of abortion services increases throughout the gestational period.

Many women, like McCormack, must travel long distances to the closest abortion provider. *See Casey*, 505 U.S. at 885-86.[9] This requires a pregnant woman take time to miss work,

---

[9]Eighty-seven percent of all counties in the United States are without an abortion provider. Guttmacher Institute, In Brief: Facts on Induced Abor-

find childcare, make arrangements for travel to and from the hospital and/or clinic, and to possibly make arrangements to stay overnight to satisfy the 24-hour requirement. *See id.* at n.9 (Blackmun, J., concurring). In fact, this has been shown to be a significant factor when a woman delays an abortion, and low-income women are more likely to have this problem. *Timing of Steps*, at 343. Once at the clinic, pregnant women may have to further manage "the harassment and hostility of antiabortion protestors demonstrating outside a clinic." *Casey*, 505 U.S. at 885-86 (citation omitted); *see* Rachel K. Jones & Kathryn Kooistra, *Abortion Incidence and Access to Services in the United States, 2008,* 43 Persp. on Sexual and Reprod. Health 41, 48 (2011) (finding that 57% of nonhospital providers experienced antiabortion harassment in 2008; levels of harassment were particularly high in the Midwest (85%) and the South (75%)).

**[6]** While the Supreme Court has permitted many restrictions that make obtaining an abortion more difficult, particularly for low-income women, *see Casey*, 505 U.S. at 886-87, it has not authorized the criminal prosecution of women seeking abortion care. Imposing criminal liability upon women for their providers' purported failure to comply with state abor-

tion in the United States 2 (2011), *available at* http://www.guttmacher.org/pubs/fb_induced_abortion.pdf. Rural women are even more affected by the lack of abortion providers. Ninety-seven percent of nonmetropolitan counties have no abortion provider. American Congress of Obstetricians and Gynecologists, Health Disparities for Rural Women (Opinion No. 429), at 2 (2009). Nonhospital abortion providers estimate that 19% of their patients travel 50-100 miles, and 8% travel more than 100 miles. *Id.* It is even worse in Idaho. In Idaho in 2008, there were only 4 abortion providers and 95% of Idaho counties were without an abortion provider. Guttmacher Institute, State Facts about Abortion: Idaho 1-2 (2011), *available at* http://www.guttmacher.org/pubs/sfaa/pdf/idaho.pdf. In fact, in 2010, of the 1,510 abortions performed on Idaho residents, nearly half were performed out of state. Idaho Bureau of Vital Records and Health Statistics, Induced Abortion Annual Report 129 (2010), *available at* http://www.healthandwelfare.idaho.gov/Portals/0/Health/Statistics/2010%20Reports/InducedAbortion.pdf.

tion regulations places a substantial obstacle in the path of women seeking an abortion. Accordingly, McCormack is likely to succeed on her claim that Chapter 6 constitutes an undue burden on a woman's constitutional right to terminate her pregnancy before viability.

### 2. *The district court did not base its decision on clearly erroneous findings of fact.*

A district court's factual findings that underlie a preliminary injunction are reviewed for clear error, and may be reversed only if "illogical, implausible, or without support in inferences that may be drawn from the facts in the record." *Am. Trucking Assn's, Inc. v. City of Los Angeles*, 660 F.3d 384, 395 (9th Cir. 2011) (quoting *United States v. Hinkson*, 585 F.3d 1247, 1251 (2009)(en banc)).

Prosecuting attorney Hiedeman asserts that the district court relied on clearly erroneous findings of fact. Specifically, he asserts that the evidence did not establish that McCormack used "FDA approved" medication prescribed by a physician. We disagree.

The district court explained that for McCormack to succeed on the merits of her "facial challenge," she must meet the standard in *Casey*: demonstrate that the statute presents a substantial obstacle to a woman's choice to undergo an abortion. The district court agreed with McCormack that at the "early stage in the proceedings," Idaho Code § 18-608 puts, "a woman . . . to the Hobson's choice [sic] of finding a means to police her healthcare provider's actions, or being threatened with criminal prosecution for her healthcare provider's failings." As in this court, Hiedeman argued before the district court that the "long line of [Supreme Court] cases" demonstrates that a pregnant woman who undergoes an abortion can be charged with a felony for violating abortion statutes. In addressing Hiedeman's argument, the district court stated that, McCormack "*clarified at oral argument* that the FDA-

approved medication she procured through the internet was prescribed by a physician." Emphasis added. The district court reasoned that based on this information, one could argue that the abortion was " 'performed' by a physician." The district court explained that "[u]nder these facts, she could be criminally prosecuted if the state determined that the physician had not complied with Idaho statutory requirements." In sum, the court concluded that McCormack had demonstrated that she was "likely to succeed on the merits of her *facial* challenge to § 18-606." Emphasis added.

**[7]** The district court's findings of fact, namely that McCormack received from a physician FDA-approved medication used to induce an abortion, were not clearly erroneous. These facts were offered in both McCormack's declaration and her complaint. McCormack stated in her declaration that the medication was "approved for use in the United States" and that these medications "are currently offered for sale over the internet by abortion providers outside southeast Idaho." In her complaint, McCormack stated that "physicians providing abortion services in the United States often prescribe medications approved by the U.S. Federal Drug Agency ("FDA") to cause women to abort their pregnancies medically, i.e., nonsurgically." She also stated in her complaint that she considered "ingesting one or more medications she reasonably believed to have been prescribed by a health care provider practicing outside Bannock County, Idaho to induce [her] abortion." There is no disputing that an affidavit and a complaint may be the basis for a preliminary injunction unless the facts are substantially controverted by counter-affidavits. *See K-2 Ski Co. v. Head Ski Co.*, 467 F.2d 1087, 1088 (9th Cir. 1972) ("A verified complaint or supporting affidavits may afford the basis for a preliminary injunction . . . ."). Here, prosecuting attorney Hiedeman did not offer any controverted affidavits as to whether the pills were obtained from a physician over the internet or whether they were FDA-approved. Additionally, the district court merely commented that oral argument provided clarity to the extent that the complaint and

affidavit had to be carefully worded because of the potential for McCormack's prosecution.

These factual findings cannot be said to be "clearly erroneous" such that the court is left with a definite and firm conviction that the district court committed a clear error of judgment. *United States v. Hinkson*, 585 F.3d 1247, 1260-61 (9th Cir. 2009) (en banc); *Alaimalo v. United States*, 645 F.3d 1042, 1060 (9th Cir. 2011) ("To be clearly erroneous, a decision must strike [the court] as more than just maybe or probably wrong; it must, as one member of this court recently stated during oral argument, strike us as wrong with the force of a five-week-old, unrefrigerated dead fish.").

**[8]** Accordingly, we conclude that the district court's findings of fact were not clearly erroneous and the court did not abuse its discretion in relying on those findings.

## II. The district court abused its discretion in crafting an overbroad preliminary injunction.

The scope of a preliminary injunction is generally reviewed for abuse of discretion. *SEC v. Interlink Data Network of Los Angeles, Inc.*, 77 F.3d 1201, 1204 (9th Cir. 1996).

The district court's preliminary injunction states that prosecuting attorney Hiedeman "is restrained from enforcing Idaho Code §§ 18-606 and 18-608(1)." Hiedeman argues that the district court's preliminary injunction is overbroad to the extent that it grants relief beyond McCormack herself. For the reasons set forth below, we conclude that the preliminary injunction is overbroad and should be limited to enforcement of the applicable code sections against McCormack only.

The Supreme Court has cautioned that "injunctive relief should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979). Injunctive relief is an

"extraordinary remedy," *Winter*, 555 U.S. at 24, and "must be tailored to remedy the specific harm alleged." *Park Vill. Apartment Tenants Ass'n v. Mortimer Howard Trust*, 636 F.3d 1150, 1160 (9th Cir. 2011). A district court abuses its discretion by issuing an "overbroad" injunction. *Id.*; *see also Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1119 (9th Cir. 2009). Moreover, the purpose of a preliminary injunction is to preserve the status quo between the parties pending a resolution of a case on the merits. *U.S. Philips Corp. v. KBC Bank N.V.*, 590 F.3d 1091, 1094 (9th Cir. 2010).

**[9]** At least one Supreme Court decision suggests that federal courts should only enjoin enforcement of criminal statutes against the plaintiffs before the court. In *Doran v. Salem Inn, Inc.*, the Court said "neither declaratory nor injunctive relief can directly interfere with enforcement of contested statutes or ordinances except with respect to the particular federal plaintiffs, and the State is free to prosecute others who may violate the statute." 422 U.S. 922, 931 (1975). We recently held that a district court abused its discretion in entering an overbroad preliminary injunction that enjoined "the rules themselves as opposed to enjoining their enforcement as to the plaintiffs before [it]." *Stormans*, 586 F.3d at 1140.

**[10]** There is no need for the preliminary injunction in this case to bar enforcement of § 18-606 against anyone except McCormack in order to preserve the status quo between the parties. The fact that McCormack may ultimately be entitled to a declaratory judgment stating that § 18-606 is unconstitutional on its face (which would clearly bar prosecution of any pregnant woman under the statute) does not mean that the *preliminary* injunction should apply so broadly, at least in the absence of class certification.

**[11]** Accordingly, we conclude that the district court's preliminary injunction should be narrowed so that it enjoins only future prosecution of McCormack.

**CROSS-APPEAL**

In her cross-appeal, McCormack makes two arguments: (1) that the district court should have enjoined enforcement of Idaho Code § 18-606 in conjunction with both §§ 18-608(1) *and 18-608(2)*; and (2) that she has standing to challenge the enforcement of Chapter 5, the Pain-Capable Unborn Child Protection Act ("PUCPA").

### III.   The district court erred in not enjoining the enforcement of Idaho Code § 18-606 in conjunction with both §§ 18-608(1) *and 18-608(2)*.

In her cross-appeal, McCormack contends that the district court should have enjoined enforcement of Idaho Code § 18-606 in conjunction with both §§ 18-608(1) *and 18-608(2)*. In granting McCormack's motion for a preliminary injunction, the district court limited the injunction to § 18-608(1), which is the code section governing abortions during the first trimester of pregnancy. The district court refused to extend the preliminary injunction to cover § 18-608(2), which is the code section governing abortions during the second trimester of pregnancy. In its order granting the preliminary injunction, the court stated that it relied on those reasons set forth in the court's September 23, 2011 memorandum. In its September 23, 2011 Memorandum Decision, the district court held that McCormack's potential punishment for violating Idaho Code § 18-606 did not extend to all challenged subsections. The district court found that "[b]ased on the facts alleged, there can be no argument that [McCormack] violated either § 18-608(2) or § 18-608(3)." Thus, the court found that McCormack "does not face any threat of prosecution under these subsections." Accordingly, the court found that there was not a case or controversy as to § 18-608(2) or § 18-608(3).

McCormack alleges that the district court erred because the basis for the district court's injunction against enforcement of Idaho Code § 18-608(1) applies with equal force to § 18-

608(2). She notes that the criminal complaint fails to cite which statute—either § 18-608(1) or § 18-608(2)—Hiedeman was charging McCormack under, in connection with § 18-606. Further, the criminal complaint makes no reference to the trimester of McCormack's pregnancy at the time of the alleged abortion. Thus, the threat she faced (and still faces based on Hiedeman's affidavit that he has not yet determined whether to re-commence the criminal action) was that she would be prosecuted for violating either subsection of the statute. For the reasons set forth below, we agree with McCormack that the district court erred in failing to extend the preliminary injunction to § 18-608(2) because McCormack faces a genuine threat of prosecution under this subsection of the statute.

This court has recognized that "neither the mere existence of a proscriptive statute nor a generalized threat of prosecution satisfies the 'case or controversy' requirement." *Thomas v. Anchorage Equal Rights Comm'n*, 220 F.3d 1134, 1139 (9th Cir. 2000) (en banc). Rather, a plaintiff must face a "genuine threat of prosecution." *Id.* In evaluating the genuineness of a claimed threat of prosecution, courts examine three factors: (1) "whether the plaintiffs have articulated a 'concrete plan' to violate the law in question," (2) "whether the prosecuting authorities have communicated a specific warning or threat to initiate proceedings," and (3) "the history of past prosecution or enforcement under the challenged statute." *Id.*; *see also Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979) (holding that, "[w]hen contesting the constitutionality of a criminal statute, it is not necessary that the plaintiff first expose himself to actual arrest or prosecution to be entitled to challenge the statute that he claims deters the exercise of his constitutional rights.") (citation and alterations omitted).**¹⁰**

---

**¹⁰**These principles extend to the abortion context. In *Griswold v. Connecticut*, 381 U.S. 479, 481 (1965), the Supreme Court concluded that a

**[12]** Applying these principles here, McCormack faced prosecution and continues to be threatened with prosecution as a result of her alleged violation of Idaho Code § 18-606, in conjunction with either § 18-608(1) or § 18-608(2). First, McCormack has allegedly already violated Idaho Code § 18-606, which makes it a felony to obtain an abortion in a manner not authorized by the Idaho abortion statutes. There is no question that prosecuting attorney Hiedeman filed felony charges against McCormack for allegedly violating Idaho Code § 18-606. But, the criminal complaint fails to specify whether in conjunction with § 18-606 Hiedeman brought charges under § 18-608(1), regulating abortions during the first trimester, or § 18-608(2), regulating abortions during the second trimester. Further, there is nothing in the criminal complaint that states the gestional age of the fetus or the trimester that McCormack was in when the alleged abortion occurred. It is also undisputed that the state court dismissed these charges without prejudice and Hiedeman has not decided whether to re-file the charges against McCormack.

medical director who had been *convicted* for giving information, instruction, and medical advice regarding contraception had standing to challenge the constitutionality of the Connecticut law. Then in *Carey v. Population Servs., Int'l*, 431 U.S. 678, 682-84 (1977), the Court held that a corporation that had been advised by New York authorities that they were violating the New York statute prohibiting sale of contraception to minors under 16, and had at least been threatened with prosecution on at least one occasion, had standing to challenge the statute. Finally, in *Planned Parenthood of Idaho, Inc. v. Wasden*, 376 F.3d 908, 916-18 (9th Cir. 2004), an abortion provider, Dr. Glenn Weyhrich, stated his clear intention to continue to perform abortions for his patients, including some minors, despite a statute prohibiting him from performing abortions on minors. *Id.* at 916. We concluded that Dr. Weyhrich's clear intention resulted in a "sufficiently concrete and imminent injury-possible prosecution and imprisonment-to challenge the provisions that ban abortion providers from performing abortions on minors." *Id.* (citing *Diamond v. Charles*, 476 U.S. 54, 65 (1986) ("A physician has standing to challenge an abortion law that poses for him a threat of criminal prosecution.")). Therefore, we held that Dr. Weyhrich had standing based upon a threat of prosecution by the county prosecuting attorney. *Id.* at 917.

Thus, McCormack is susceptible to Hiedeman re-commencing the criminal charges against McCormack under § 18-606 in conjunction with either § 18-608(1) *or § 18-608(2)*. Second, Hiedeman, in his capacity as county prosecutor, has communicated a specific threat on two occasions to bring felony charges against McCormack, when he: (1) actually brought a criminal complaint against McCormack, and (2) filed a declaration stating that he may still re-file the complaint. Finally, this history of past prosecution, in the form of an actual criminal complaint being filed against McCormack under Idaho Code § 18-606, weighs in favor of a preliminary injunction for McCormack with regard to § 18-606 in conjunction with both § 18-608(1) and § 18-608(2).

**[13]** Thus the possibility exists that Hiedeman was going to (and may still) bring criminal charges against McCormack based on her alleged violation of either § 18-608(1) *or* § 18-608(2).[11] Accordingly, we conclude that the district court erred in failing to extend the preliminary injunction to § 18-608(2) in conjunction with § 18-606.

## IV.  McCormack does not have standing to seek pre-enforcement prospective relief against the enforcement of the PUCPA.

In her cross-appeal, McCormack also argues that she has standing to challenge the enforcement of Chapter 5, the "PUCPA." PUCPA categorically bans non-therapeutic abortions at and after twenty weeks. "Any person who intentionally or recklessly performs or attempts to perform an abortion in violation of the provisions of section 18-505, Idaho Code,

---

[11]It appears to some extent Hiedeman concedes this argument. In his reply brief, Hiedeman states in a footnote that, "As [he] understands the injunction, he is precluded from initiating *any* prosecution under § 18-606 against the mother of an allegedly aborted fetus." Therefore, Hiedeman appears to agree that he cannot bring criminal charges under either § 18-606(1) or § 18-606(2).

is guilty of a felony." Idaho Code § 18-507. PUCPA further states: "No penalty shall be assessed against the woman upon whom the abortion is performed or attempted to be performed." *Id.* PUCPA also provides civil remedies in the form of actual damages to "[a]ny woman upon whom an abortion has been performed in violation of the [PUCPA] or the father of the unborn child." Idaho Code § 18-508(1). PUCPA further permits certain persons, including a prosecuting attorney, to file an action for injunctive relief against an abortion provider who violates § 18-505 by performing an abortion at or after twenty weeks.[12] Idaho Code § 18-508(2).

PUCPA was not enacted without controversy. Idaho's own Attorney General explained in a 17-page letter that PUCPA "plainly intends to erect a substantial obstacle to the right to choose," and "there is strong reason to believe that [PUCPA] is unconstitutional under existing precedent."[13]

---

[12]It is worth noting that this law is directed at a relatively small percentage of abortions, both nationally and within Idaho. In 2008, the most recent year for which abortion statistics are available from the Centers for Disease Control and Prevention, there were approximately 825,564 abortions performed in the United States. Karen Pazol et al., Centers for Disease Control and Prevention, Abortion Surveillance-United States, 2008, at 1 (2011). Of these abortions, only 7.3% were performed at 14-20 weeks' gestation, and only 1.3% performed in or after the 21st week of gestation. *Id.* In Idaho, in 2010, there were 1,510 abortions. Idaho Bureau of Vital Records, *supra* at 129; *id.* at 167 (The Idaho population in 2010, was 1,567,582). Of the 1,510 abortions, only 6 were performed at 16-20 weeks' gestation, 5 performed at 21-24 weeks' gestation, and 1 performed in or after the 25th week of gestation. *Id.* at 133.

[13]The Attorney General noted that Supreme Court precedent establishes:

> the Act's various restrictions operate, at least in part, prior to viability. First, twenty weeks precedes the usual viability point, as recognized in *Roe* and *Danforth*, by at least four weeks . . . . Second, although technology advances since the 1970s have made it easier to sustain life outside the womb at an earlier state, it seems clear that, in at least a fair percentage of pregnancies today, the fetus is not viable by twenty weeks.

Thus, "[b]ecause the Act's restrictions apply at twenty weeks, they operate pre-viability for at least some portion of pregnancies." With regard to the legislative findings, the Idaho Attorney General admits that these findings "do not disturb [its] analysis."

The district court determined that McCormack lacked standing to challenge enforcement of PUCPA and, for that reason, refused to issue a preliminary injunction enjoining Hiedeman from criminally prosecuting or bringing any civil action for injunctive relief against abortion providers. The district court concluded that McCormack does not allege that she was pregnant when she filed this action nor does she allege that her past conduct in purchasing medication to induce an abortion would fall within the proscription of PUCPA. Further, the court found that her testimony that she would seek an abortion if she became pregnant did not suffice to give her standing.

McCormack concedes that her challenge to PUCPA is "pre-enforcement." McCormack has not been prosecuted or threatened with prosecution under PUCPA. But, McCormack argues that because no physician located in southeast Idaho offers pre-viability abortions to women beyond the 19th week of their pregnancy, no physician will have standing to challenge the constitutionality of PUCPA. Nevertheless, McCormack relies on the fact that she was criminally charged under Chapter 6 (§ 18-606) as proof of potential future criminal charges under PUCPA (Chapter 5). She also argues that based on her prior status as a pregnant woman, she should have standing to challenge this statute.

1. *Standing based on the possibility of future criminal charges under PUCPA.*

In contrast to the previous issue regarding Chapter 6 (including § 18-606, § 18-608(1) and § 18-608(2)), no charges were brought against McCormack under Chapter 5 (PUCPA). Hiedeman brought charges only under § 18-606, alleging that McCormack purposely terminated her own pregnancy in a manner not authorized by statute. Although McCormack was prosecuted for submitting to a pre-viability abortion, PUCPA was not even enacted at the time the criminal complaint was filed.

McCormack argues, however, that she remains threatened with prosecution under PUCPA based on the prior Chapter 6 criminal case being dismissed without prejudice and Hiedeman's declaration that he may re-commence a prosecution. She argues:

> it is irrelevant which statute or subsection of a statute Hiedeman may choose to use to prosecute McCormack . . . for terminating a pregnancy in Bannock County. McCormack is threatened by a repetition of her alleged injury by the threat Hiedeman will prosecute her or her provider again under any applicable statute for terminating pregnancy in Bannock County.

She asserts that to determine issues of standing, the court must look to the facts as they existed at the time the complaint was filed. *American Civil Liberties Union of Nevada v. Lomax*, 471 F.3d 1010, 1015 (9th Cir. 2006); *Clark v. City of Lakewood*, 259 F.3d 996, 1006 (9th Cir. 2001) ("Standing is determined by the facts as they exist at the time the complaint is filed"). Here, when McCormack filed her civil complaint on September 16, 2011, PUCPA was enacted. Idaho Code § 18-501 (enacted April 13, 2011). Thus, she asserts that the court can consider the effect that PUCPA has on McCormack's *prospective* chance of being criminally charged.

[14] McCormack cannot satisfy *Thomas*' three-part test, set forth above, for determining whether a plaintiff faces a "genuine threat of prosecution" under PUCPA. *See* 220 F.3d at 1139. First, McCormack does not have a "concrete plan" to violate PUCPA. PUCPA explicitly excludes women from criminal liability. Idaho Code § 18-507 ("No penalty shall be assessed against the woman upon whom the abortion is performed or attempted to be performed."). Therefore, there is no "concrete" way for McCormack to violate the law as an individual pregnant woman because PUCPA specifically excludes women from criminal liability. Second, the "prosecuting

authorities have [not] communicated a specific warning or threat to initiate proceedings" under PUCPA. *Thomas*, 220 F.3d at 1139. Hiedeman's declaration specifically states: "My office has not determined as of this date whether new or additional evidence is or may become available to warrant recommencing a prosecution under § 18-606." Thus, the only threat of future prosecution is under Chapter 6, not Chapter 5 (PUCPA). Finally, the third *Thomas* factor does not tilt in her favor because there is no history of past prosecution or enforcement under PUCPA. McCormack was prosecuted under Chapter 6, not Chapter 5 (PUCPA).

In short, McCormack does not face a genuine threat of prosecution under PUCPA sufficient to confer standing to challenge the statute.

> 2.  *Standing based on her testimony that she would seek an abortion if she became pregnant.*

McCormack's testimony that she would seek an abortion if she became pregnant does not suffice to give her standing. It is undisputed that McCormack was not pregnant when she filed this lawsuit. As a result, she does not have standing under any theory articulated in *Roe*.

In contrast with Jane Roe and akin to McCormack's position, the *Roe* Court found that John and Mary Doe, a married couple who filed a companion complaint along with Roe's, did not have standing. *Roe*, 410 U.S. at 127-129. The Does alleged that they were childless, that Mrs. Doe was not pregnant, and that they had been advised that Mrs. Doe should avoid pregnancy for medical and "other highly personal reasons." *Id.* at 127. They alleged that if Mrs. Doe became pregnant, they would want to terminate the pregnancy by abortion. *Id.* at 128. They also alleged that they were injured because they were forced to choose between abstaining from normal sexual relations or putting Mrs. Doe's health at risk through a possible pregnancy. *Id.* The Court said, "[t]heir claim is that

sometime in the future Mrs. Doe might become pregnant because of possible failure of contraceptive measures, and at that time in the future she might want an abortion that might then be illegal under the Texas statutes." *Id.* The Court concluded that the Does did not have standing:

> Their alleged injury rests on possible future contraceptive failure, possible future pregnancy, possible future unpreparedness for parenthood, and possible future impairment of health. Any one or more of these several possibilities may not take place and all may not combine. In the Does' estimation, these possibilities might have some real or imagined impact on their marital happiness. But we are not prepared to say that the bare allegation of so indirect an injury is sufficient to present an actual case or controversy.

*Id.; see also Abele v. Markle,* 452 F.2d 1121, 1124-25 (2d Cir. 1971) (holding that non-pregnant plaintiffs had no standing to challenge abortion statute solely on basis of childbearing age because "[a]lthough some of them may in the future become pregnant and may in such event desire an abortion . . . it is also possible that they will not become pregnant or that if they do they will, upon further reflection, decide for other reasons against an abortion. . . . It is clear that any threat of harm to them is remote and hypothetical.").

As with the Does, in McCormack's case there are too many "possibilities that may not take place and all may not combine." *Roe*, 410 U.S. at 128. Therefore, McCormack does not have standing to challenge PUCPA based on the fact that she was pregnant before filing her civil complaint or based on a possible future pregnancy.

>   3.   *Standing based on the alleged chilling effect PUCPA will have on doctors' willingness to provide abortions after nineteen weeks in Idaho.*

McCormack asserts she is injured by PUCPA because it will have the effect of ensuring that there are no providers

willing to provide an abortion after 19 weeks of pregnancy in southeast Idaho. But the record demonstrates that there were no providers physically located in southeast Idaho willing to perform any abortions before the law was enacted.

[15] Even if a doctor could bring a challenge to PUCPA on the basis of potential prosecution, McCormack cannot do so on behalf of an unnamed provider. Accordingly, the district court did not err in determining that McCormack lacked standing to challenge PUCPA.[14]

## CONCLUSION

For the reasons discussed above, we affirm in part and reverse in part the district court's grant of a preliminary injunction. Specifically, we AFFIRM the district court's determination that McCormack will likely succeed with her facial constitutional challenges to Idaho Code §§ 18-606 and 18-608(1) and; AFFIRM the district court's conclusion that McCormack lacked standing to seek pre-enforcement relief against the enforcement of PUCPA.

We REVERSE the scope of the injunction to the extent that it grants relief beyond McCormack. We also REVERSE the district court's determination that McCormack did not have standing to enjoin enforcement of Idaho Code § 18-608(2) in conjunction with § 18-606. Each party shall bear its own costs on appeal.

**AFFIRMED in part, REVERSED in part, and REMANDED.**

---

[14]Our holding does not foreclose other constitutional challenges to PUCPA, in the event that a party can demonstrate standing.