FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| PAUL A. ISAACSON, M.D.; WILLIAM CLEWELL, M.D.; HUGH MILLER, M.D., *Plaintiffs-Appellants*, v. TOM HORNE, Attorney General of Arizona, in his official capacity; WILLIAM GERARD MONTGOMERY, County Attorney for Maricopa County, in his official capacity; BARBARA LAWALL, County Attorney for Pima County, in her official capacity; ARIZONA MEDICAL BOARD; LISA WYNN, Executive Director of the Arizona Medical Board, in her official capacity, *Defendants-Appellees*. | No. 12-16670 D.C. No. 2:12-cv-01501-JAT OPINION |

Appeal from the United States District Court
for the District of Arizona
James A. Teilborg, District Judge, Presiding

Argued and Submitted
November 5, 2012—San Francisco, California

Filed May 21, 2013

Before: Mary M. Schroeder, Andrew J. Kleinfeld, and
Marsha S. Berzon, Circuit Judges.

Opinion by Judge Berzon;
Concurrence by Judge Kleinfeld

## SUMMARY[*]

### Civil Rights

The panel reversed the district court's order denying
declaratory and injunctive relief to plaintiffs and held that the
Constitution does not permit the Arizona legislature to
prohibit abortion beginning at twenty weeks gestation, before
the fetus is viable.

The panel held that under controlling Supreme Court
precedent, Arizona may not deprive a woman of the choice to
terminate her pregnancy at any point prior to viability. The
panel held that Arizona House Bill 2036, enacted in April
2012, effects such a deprivation by prohibiting abortion from
twenty weeks gestational age through fetal viability. The
panel held that the twenty-week law is therefore
unconstitutional under an unbroken stream of Supreme Court
authority, beginning with *Roe v. Wade*, 410 U.S. 113 (1973),
and ending with *Gonzales v. Carhart*, 550 U.S. 124 (2007).

Concurring, Judge Kleinfeld stated that the current state
of the law compelled him to concur, and that what controls

---

[*] This summary constitutes no part of the opinion of the court. It has
been prepared by court staff for the convenience of the reader.

this case is that the parties do not dispute that the twenty-week line Arizona has drawn is three or four weeks prior to viability.

**COUNSEL**

Janet Crepps (argued) and David Brown, Center for Reproductive Rights, New York, New York; Christopher A. Lavoy, Tiffany & Bosco, P.A., Phoenix, Arizona; Janie F. Shulman and Nancy R. Thomas, Morrison & Foerster LLP, Los Angeles, California, for Plaintiff-Appellant Paul A. Isaacson.

Susan Talcott Camp and Alexa Kolbi-Molinas, American Civil Liberties Union Foundation, New York, New York; Daniel Pochoda and Kelly Flood, American Civil Liberties Union Foundation of Arizona, Phoenix, Arizona, for Plaintiffs-Appellants William Clewell and Hugh Miller.

David R. Cole (argued), Solicitor General; Thomas M. Collins, Assistant Attorney General, Arizona Attorney General's Office, Phoenix, Arizona, for Defendants-Appellees Thomas C. Horne, Arizona Attorney General, Arizona Medical Board, and Lisa Wynn, Executive Director of the Arizona Medical Board.

William G. Montgomery (argued), County Attorney for Maricopa County; Douglas L. Irish, J. Kenneth Mangum, Louis F. Comus III, Deryck R. Lavelle, and Bruce P. White, Maricopa County Attorney's Office, Phoenix, Arizona, for Defendant-Appellee William Montgomery.

Paula J. Perrera (argued), Deputy County Attorney, Pima County Attorney's Office, Tucson, Arizona, for Defendant-Appellee Barbara LaWall.

Beth H. Parker and Gabriel N. White, Arnold & Porter LLP, San Francisco, California; Lisa Hill Fenning, Los Angeles, California; Kimberley A. Parker, Susan Friedman, and Carolyn Jacobs Chachkin, Wilmer Cutler Pickering Hale and Dorr LLP, Washington, D.C.; Alan E. Schoenfeld and Fiona J. Kaye, New York, New York, for Amici Curiae American College of Obstetricians and Gynecologists and American Congress of Obstetricians and Gynecologists.

Denise M. Burke, Mailee R. Smith, and Clarke D. Forsythe, Americans United for Life, Washington, D.C., for Amici Curiae Association of American Physicians & Surgeons, American Association of Pro-Life Obstetricians and Gynecologists, Christian Medical & Dental Associations, Catholic Medical Association, Physicians for Life, and National Association of Prolife Nurses.

David J. Cantelme, Cantelme & Browne, P.L.C., Phoenix, Arizona; Joshua A. Kredit, Center for Arizona Policy, Inc., Phoenix, Arizona, for Amicus Curiae Center for Arizona Policy, Inc.

Teresa Stanton Collett, University of St. Thomas School of Law, Minneapolis, Minnesota; Steven H. Aden and M. Casey Mattox, Alliance Defending Freedom, Washington, D.C., for Amicus Curiae Doctors on Fetal Pain.

Gregrey G. Jernigan, General Counsel, Office of the President of the Arizona State Senate, Phoenix, Arizona; Peter A. Gentala, Office of the Speaker of the Arizona House of Representatives, Phoenix, Arizona, for Amici Curiae Andrew M. Tobin, Speaker of the Arizona House of Representatives, and Steve Pierce, President of the Arizona Senate.

Mathew D. Staver and Anita L. Staver, Liberty Counsel, Maitland, Florida; Stephen M. Crampton and Mary E. McAlister, Liberty Counsel, Lynchburg, Virginia, for Amicus Curiae Liberty Counsel.

**OPINION**

BERZON, Circuit Judge:

Our question is whether the Constitution permits the Arizona legislature to prohibit abortion beginning at twenty weeks gestation, before the fetus is viable. We hold that it does not.

Arizona House Bill 2036 ("H.B. 2036" or "the Act"), enacted in April 2012, forbids, except in a medical emergency, abortion of a fetus determined to be of a gestational age of at least twenty weeks. Arizona law separately prohibits abortions after fetal viability unless necessary to preserve the pregnant woman's life or health. *See* Ariz. Rev. Stat. § 36-2301.01(A)(1). The challenged provision in Section 7 of H.B. 2036 ("Section 7" or "the

twenty-week law")[1] extends the abortion ban earlier in pregnancy, to the period between twenty weeks gestation and fetal viability. Because Section 7 deprives the women to whom it applies of the ultimate decision to terminate their pregnancies prior to fetal viability, it is unconstitutional under a long line of invariant Supreme Court precedents.

Since *Roe v. Wade*, 410 U.S. 113 (1973), the Supreme Court case law concerning the constitutional protection accorded women with respect to the decision whether to undergo an abortion has been unalterably clear regarding one basic point, although it has varied in other respects: a woman has a constitutional right to choose to terminate her pregnancy before the fetus is viable. A prohibition on the exercise of that right is *per se* unconstitutional. While the state may *regulate* the mode and manner of abortion prior to fetal viability, it may not *proscribe* a woman from electing abortion, nor may it impose an undue burden on her choice through regulation.

The challenged Arizona statute's medical emergency exception does not transform the law from a prohibition on abortion into a regulation of abortion procedure. Allowing a *physician* to decide if abortion is medically necessary is not the same as allowing a *woman* to decide whether to carry her own pregnancy to term. Moreover, regulations involve limitations as to the mode and manner of abortion, not preclusion of the choice to terminate a pregnancy altogether. Arizona's twenty-week law is a preclusion prior to fetal

---

[1] Section 7 of H.B. 2036 encompasses provisions to be codified at Arizona Revised Statutes § 36-2158 and § 36-2159. As this lawsuit challenges only the provision to be codified at § 36-2159, all references to Section 7 in this opinion denote only the challenged portion thereof.

viability and is thus invalid under binding Supreme Court precedent.

The district court erred in denying declaratory and injunctive relief and entering judgment in favor of the State. We therefore reverse.

## Background

### I.

On April 12, 2012, Arizona Governor Jan Brewer signed H.B. 2036 into law, amending title 36, chapter 20, article 1 of the Arizona Revised Statutes, which governs the availability and performance of abortions in the state. The Act was to go into effect on August 2, 2012, but we granted an emergency injunction on August 1, 2012, staying enforcement of the challenged provision pending this appeal.

The challenged portion of Section 7, codified at Arizona Revised Statutes § 36-2159, reads:

> A. Except in a medical emergency, a person shall not perform, induce or attempt to perform or induce an abortion unless the physician or the referring physician has first made a determination of the probable gestational age of the unborn child. In making that determination, the physician or referring physician shall make any inquiries of the pregnant woman and perform or cause to be performed all medical examinations, imaging studies and tests as a reasonably prudent physician in the community, knowledgeable

about the medical facts and conditions of both the woman and the unborn child involved, would consider necessary to perform and consider in making an accurate diagnosis with respect to gestational age.

B. Except in a medical emergency, a person shall not knowingly perform, induce or attempt to perform or induce an abortion on a pregnant woman if the probable gestational age of her unborn child has been determined to be at least twenty weeks.

Ariz. Rev. Stat. § 36-2159. Arizona law defines "medical emergency" as:

a condition that, on the basis of the physician's good faith clinical judgment, so complicates the medical condition of a pregnant woman as to necessitate the immediate abortion of her pregnancy to avert her death or for which a delay will create serious risk of substantial and irreversible impairment of a major bodily function.

Ariz. Rev. Stat. § 36-2151(6). The stated purpose of the Act is to "[p]rohibit abortions at or after twenty weeks of gestation, except in cases of a medical emergency, based on the documented risks to women's health and the strong medical evidence that unborn children feel pain during an

abortion at that gestational age." H.B. 2036, sec. 9(B)(1).**[2]** The Act lists a number of legislative findings in support of the assertions in the purpose provision, with citations to medical research articles. *See* H.B. 2036, sec. 9(A)(1)–(7).

## II.

The plaintiffs in this action are three board-certified obstetrician-gynecologists who practice in Arizona ("the Physicians"). In July 2012, they filed suit in the United States District Court for the District of Arizona, seeking declaratory and injunctive relief against enforcement of Section 7 on behalf of themselves and of their patients wishing to terminate pre-viability**[3]** pregnancies at or after twenty weeks.**[4]** Their complaint named three state defendants and two county defendants: the Attorney General of Arizona, Tom Horne; the Arizona Medical Board; and the Executive Director of the Arizona Medical Board, Lisa Wynn (collectively "State Defendants"); the County Attorney for Pima County, Barbara LaWall; and the County Attorney for Maricopa County, William Montgomery.

---

**[2]** "Gestational age," as used by the Arizona legislature and throughout this opinion, refers to the age of a fetus calculated from the first day of the pregnant woman's last menstrual period. *See* Ariz. Rev. Stat. § 36-2151(4).

**[3]** As used throughout this opinion, "viability" refers to "the time at which there is a realistic possibility of maintaining and nourishing a life outside the womb." *Planned Parenthood v. Casey*, 505 U.S. 833, 870 (1992) (citing *Roe*, 410 U.S. at 163).

**[4]** The parties to this suit agree that no fetus is viable at twenty weeks gestational age and that a healthy fetus typically attains viability at twenty-three or twenty-four weeks, at the earliest.

In their respective practices, each of the Physicians performs abortions before fetal viability and at and after twenty weeks gestational age. They assert that their patients seek pre-viability abortions "for a variety of reasons, including that continuation of the pregnancy poses a threat to their health, that the fetus has been diagnosed with a medical condition or anomaly, or that they are losing the pregnancy ('miscarrying')." Under Arizona's twenty-week law, the complaint alleges, these women will be unable to terminate their pregnancies before fetal viability unless they have a medical emergency falling within the Act's narrow exception. Therefore, the Physicians assert, the law violates their patients' Fourteenth Amendment substantive due process rights.

The Physicians moved for a preliminary injunction, which the State Defendants and Defendant Montgomery opposed. Defendant Montgomery also filed a motion to dismiss the action. After Defendant LaWall expressed support for the preliminary injunction, Defendant Montgomery sought her dismissal as a party defendant.[5]

On July 25, 2012, the district court held a hearing on the Physicians' motion for a preliminary injunction and the motions to dismiss. Following the hearing, and without any prior notice to the parties, the court *sua sponte* and retroactively consolidated the preliminary injunction hearing with a trial on the merits and issued a final decision denying all relief. The order denied the Physicians' requests for both

---

[5] Because Defendant LaWall neither opposed the Physicians' motion for a preliminary injunction nor argued in favor of Section 7 before this court, references in this opinion to Defendants' arguments refer only to the State Defendants and/or to Defendant Montgomery.

preliminary and permanent injunctions and for a declaratory judgment. The court simultaneously denied Defendants' motion to dismiss the action and denied as moot the motion to dismiss Defendant LaWall.

The district court's decision was premised on three central conclusions: First, although the Physicians characterized their suit as an as-applied challenge because limited to those post-twenty-week abortions that occur before viability, the court held that the suit is properly considered a facial challenge. The court recognized that the application of Section 7 challenged by the Physicians is the law's only effective application: to prohibit pre-viability abortions from twenty weeks gestation.[6]

Second, the court held that Section 7 regulates, rather than prohibits, abortion at and after twenty weeks gestational age, principally because it contains a medical emergency exception permitting some abortions after twenty weeks gestation. The law "is not a ban on previability abortions," the court stated, "but is rather a limit on some previability abortions between 20 weeks gestational age and viability."

Finally, the court determined that, considered as a regulation rather than a prohibition, the challenged provision of H.B. 2036 may "prompt a few women, who are

---

[6] As noted *supra*, prior to the adoption of H.B. 2036, Arizona law already prohibited post-viability abortions. *See* Ariz. Rev. Stat. § 36-2301.01(A)—(B) ("A physician shall not knowingly perform an abortion of a viable fetus unless . . . [t]he physician states in writing before the abortion is performed that the abortion is necessary to preserve the life or health of the woman, specifying the medical indications for and the probable health consequences of the abortion. . . . This section does not apply if there is a medical emergency.").

considering abortion as an option, to make the ultimate decision earlier than they might otherwise have made it," but the law does not impose a substantial obstacle to abortions, because it does not strip women of the ability to choose to terminate their pregnancies *before* twenty weeks. This "time limitation" on the right to obtain a pre-viability abortion, the district court concluded, is justified by legitimate state interests in fetal life and the health of pregnant women.

For the reasons summarized above, the district court concluded that the Physicians' facial challenge to Section 7 fails. In the district court's view, an as-applied challenge by an affected pregnant woman would be the proper vehicle for determining whether the law unconstitutionally deprives a woman of "the right to make the abortion choice previability."

The Physicians timely appealed.

## Discussion

### I.

We begin by addressing two preliminary issues.

First, the district court presumed the parties "agree that the facts at issue in this case are not materially in dispute, and agree that the Court needs no additional evidence or legal argument to reach its decision." On that basis, the court invoked Federal Rule of Civil Procedure 65(a)(2) and consolidated the preliminary injunction hearing with a trial on the merits when it issued its opinion.

"A district court may consolidate a preliminary injunction hearing with a trial on the merits," but only when it provides the parties with "clear and unambiguous notice [of the intended consolidation] either before the hearing commences or at a time which will afford the parties a full opportunity to present their respective cases." *Air Line Pilots Ass'n Int'l v. Alaska Airlines, Inc.*, 898 F.2d 1393, 1397 (9th Cir. 1990) (alteration in original) (quoting *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981)) (internal quotation marks omitted); *see also* Fed. R. Civ. P. 65(a)(2). No such notice occurred here, nor is there any indication that the parties requested or favored consolidation. In fact, Defendant Montgomery specifically registered in advance his objection to "the hearing being turned into a hearing on a permanent injunction under Rule 65," citing time pressures that would prevent assembly of necessary data in support of his arguments.

Were the factual record or the district court's factual findings of pertinence to our decision, we would be troubled by the procedure followed. But neither party has challenged the district court's approach. And because we ultimately agree with the Physicians that this case is fully controlled by binding precedent, the truncated nature of the record does not matter to our decision. We therefore do not consider this procedural matter further. For the same reason, we do not address whether the district court's "findings" are supported by the record or discuss the degree of deference owed to the legislative findings recited in the Act.[7]

---

[7] We note, however, that the sort of "legislative facts" addressed by the parties and by the district court are often considered by appellate courts from publicly available primary sources even if not developed in the record. *See, e.g.*, *McCormack v. Hiedeman*, 694 F.3d 1004, 1016–18 & nn.8–9, 1022 n.12 (9th Cir. 2012) (citing medical studies regarding the

Second, the district court did not address the Physicians'
standing to bring a challenge on their own behalf and that of
their patients. "We nonetheless recognize our independent
obligation to examine our own jurisdiction," *Indep. Living
Ctr. of S. Cal. v. Shewry*, 543 F.3d 1050, 1064 (9th Cir. 2008)
(internal quotation marks omitted), and therefore, as the issue
came up at oral argument, briefly address the Physicians'
Article III standing.

To satisfy Article III standing, the Physicians must
demonstrate that they suffer concrete injury that is actual or
imminent, not conjectural or hypothetical; that there is a
causal connection between this injury and the challenged
statute; and that the injury will likely be redressed by a
favorable decision. *See Lujan v. Defenders of Wildlife*,
504 U.S. 555, 560–61 (1992).

In their complaint and accompanying affidavits, the
Physicians allege that they have performed and will continue
to perform pre-viability abortions on patients at or after
twenty weeks gestation, for which they would face criminal
penalties should the twenty-week law go into effect. "A
physician has standing to challenge an abortion law that poses

---

health effects of abortion and statistics on the availability and performance
of abortions in Idaho and nationally); *Roe*, 410 U.S. at 149 n.44 (citing
medical research regarding morbidity and mortality rates for abortions and
childbirth); *Gonzales v. Carhart*, 550 U.S. 124, 173 n.3 (2007) (Ginsburg,
J., dissenting) (citing numerous medical articles regarding obstacles to
abortion and associated risks); *see also* Allison Orr Larsen, *Confronting
Supreme Court Fact Finding*, 98 Va. L. Rev. 1255, 1262 (2012)
(presenting research documenting "over one hundred examples of
Supreme Court opinions from the last fifteen years that make assertions
of legislative fact supported by an authority never mentioned in any of the
briefs").

for him a threat of criminal prosecution." *Diamond v. Charles*, 476 U.S. 54, 65 (1986). Whether the Physicians continue to perform pre-viability abortions past twenty weeks and risk prosecution under the statute or desist from performing them to avoid penalties, their liberty is concretely affected. *See Planned Parenthood of Idaho, Inc. v. Wasden*, 376 F.3d 908, 916–17 (9th Cir. 2004). Therefore, the Physicians have alleged a sufficiently concrete injury to challenge the provision banning providers from performing abortions on women whose pregnancies have reached twenty weeks gestation.

The Physicians do not seek relief on the basis of their own right to perform abortions, however, but on the basis of the constitutional right of their patients. Courts ordinarily do not allow third parties to litigate the rights of others. "Since at least *Singleton v. Wulff*, however, it has been held repeatedly that physicians may acquire *jus tertii* standing to assert their patients' due process rights in facial challenges to abortion laws." *Id*. at 917 (citing *Singleton v. Wulff*, 428 U.S. 106, 117–18 (1976) (plurality opinion)). Recognizing the confidential nature of the physician-patient relationship and the difficulty for patients of directly vindicating their rights without compromising their privacy, the Supreme Court has entertained both broad facial challenges and pre-enforcement as-applied challenges to abortion laws brought by physicians on behalf of their patients. *See, e.g.*, *Stenberg v. Carhart*, 530 U.S. 914, 922–23 (2000); *Planned Parenthood v. Casey*, 505 U.S. 833, 845 (1992); *City of Akron v. Akron Ctr. for Reprod. Health*, 462 U.S. 416, 440 n.30 (1983), *overruled on other grounds by Casey*, 505 U.S. at 882 (plurality opinion); *Planned Parenthood of Cent. Mo. v. Danforth*, 428 U.S. 52, 62 & n.2 (1976).

There is no dispute that the injury of which the Physicians complain is traceable to the challenged statute. Nor is there any doubt that a favorable decision, enjoining enforcement of the twenty-week law, would redress the injury. As the Physicians who bring this challenge to Section 7 therefore have standing to sue, we may consider the constitutional arguments they raise on behalf of their patients seeking pre-viability abortions at or after twenty weeks gestation. *See Wasden*, 376 F.3d at 918.

## II.

## A.

A woman has a constitutional right to choose to terminate her pregnancy before the fetus is viable without undue interference by the state. *See Casey*, 505 U.S. at 846.[8] This right is encompassed within a woman's right to personal privacy, *see Roe*, 410 U.S. at 153–54; *see also Wasden*, 376 F.3d at 921 (recognizing that "[a]dult women have a Fourteenth Amendment right to terminate a pre-viability pregnancy"), and "is a rule of law and a component of liberty we cannot renounce," *Casey*, 505 U.S. at 871 (plurality opinion). At bottom, the right recognized by *Roe* and

---

[8] The three-Justice lead opinion in *Casey* is in some sections the opinion of the Court and in other sections a limiting concurrence. Although Part IV of the opinion, enunciating the undue burden test, was endorsed by only three Justices, as the narrowest ground for the Court's holding it is as binding on this court as would be a majority opinion. *See Wasden*, 376 F.3d at 921 n.11 (citing *Marks v. United States*, 430 U.S. 188, 193 (1977); *Planned Parenthood of Wis. v. Doyle*, 162 F.3d 463, 473 (7th Cir. 1998)). Unless otherwise specified, all references to *Casey* are to the parts of the joint opinion representing the opinion of the Court.

reaffirmed by *Casey* is "the woman's right to make the *ultimate decision*." *Id.* at 877 (emphasis added).

A woman's right to terminate her pregnancy is not, however, absolute. "*Roe* did not declare an unqualified 'constitutional right to an abortion.' . . . Rather, the right protects the woman from unduly burdensome interference with her freedom to decide whether to terminate her pregnancy." *Maher v. Roe*, 432 U.S. 464, 473–74 (1977) (emphasis added). A woman's right must be considered against important state interests in "safeguarding health, in maintaining medical standards, and in protecting potential life." *Roe*, 410 U.S. at 154.

Under the trimester framework originally established in *Roe*, those interests could not justify any regulation of abortion during the first trimester of pregnancy. Prior to twelve weeks gestation, the Court held, "the abortion decision and its effectuation must be left to the medical judgment of the pregnant woman's attending physician." *Id.* at 164. During the second trimester, *Roe* concluded, the state's interest in the health of the pregnant woman is sufficiently compelling to permit regulation of "the abortion procedure in ways that are reasonably related to maternal health." *Id.* The state's interest in "the potentiality of human life," however, only becomes compelling at the point of viability; thereafter, *Roe* held, the state "may, if it chooses, regulate and even proscribe, abortion except where it is necessary, in appropriate medical judgment, for the preservation of the life or health of the mother." *Id.* at 164–65.

*Casey* jettisoned this trimester framework and the strict scrutiny standard applied in *Roe*, *see Casey*, 505 U.S. at 871–73 (plurality opinion), holding that state interests in

women's health and fetal life are present and "substantial" from the outset of pregnancy, *id.* at 846 (joint opinion), 876 (plurality opinion).  But *Casey* reaffirmed—and *Gonzales v. Carhart*, 550 U.S. 124 (2007), has since reiterated—*Roe*'s central holding: "Before viability, the State's interests are not strong enough to support a prohibition of abortion or the imposition of a substantial obstacle to the woman's effective right to elect the procedure."  *Casey*, 505 U.S. at 846; *Gonzales*, 550 U.S. at 145.  That principle is binding upon us and decides this case.

## B.

Defendants contend otherwise, characterizing the viability line first drawn in *Roe*, reaffirmed in *Casey*, and recognized again in *Gonzales*, as dicta rather than controlling Supreme Court precedent.  That characterization is most certainly incorrect.

*Roe* identified fetal viability as the earliest point in pregnancy when the state's interest becomes sufficiently compelling to justify not just *regulation* of the abortion procedure, but *proscription* of abortion unless necessary to preserve the life or health of the mother.  *Roe*, 410 U.S. at 163–65.  Since *Roe*, the Supreme Court and lower federal courts have repeated over and over again that viability remains the fulcrum of the balance between a pregnant woman's right to control her body and the state's interest in preventing her from undergoing an abortion.

*Colautti v. Franklin*, for example, emphasized: "Viability is the critical point. And [the Court has] recognized no attempt to stretch the point of viability one way or the other." 439 U.S. 379, 389 (1979).  *City of Akron v. Akron Center for*

*Reproductive Health* echoed *Roe*'s holding that viability
marks the point after which the state may proscribe abortion;
before then, only regulation is permissible. 462 U.S. at
419–20 & n.1, 428.   And while *Webster v. Reproductive
Health Services* upheld a law requiring doctors to test for
viability from twenty weeks gestational age on, 492 U.S. 490,
519–20 (1989), it did not alter the principle that
viability—not gestational age—remains *the* "critical point,"
*id.* at 529 (O'Connor, J., concurring).[9]

Although the plurality opinion in *Casey* abandoned *Roe*'s
trimester framework, 505 U.S. at 873, the Court yet again
affirmed "*Roe*'s central holding, that *viability* marks the
earliest point at which the State's interest in fetal life is
constitutionally adequate to justify a legislative ban on
nontherapeutic abortions," *id.* at 860 (joint opinion)
(emphasis added).   The plurality opinion explained that the
Court was again drawing the line at viability "so that before
that time the woman has a right to choose to terminate her
pregnancy," emphasizing that "there is no line other than
viability which is more workable."   *Id.* at 870 (plurality
opinion).

Echoing the joint opinion in *Casey*, *Stenberg* took as the
starting point of its analysis the "established principle[]" that,
"before 'viability . . . the woman has a right to choose to

---

[9] The central difference between the Arizona statute here challenged and
the Missouri statute at issue in *Webster* is that the Arizona law not only
requires *testing* of gestational age prior to the performance of an abortion,
but also predicates the permissibility of an abortion on gestational age.
The statute at issue in *Webster* required doctors to perform tests necessary
to determine gestational age, but it predicated the permissibility of
abortion on the physician's assessment of *fetal viability*, not gestational
age. *See Webster*, 492 U.S. at 500–01.

terminate her pregnancy.'"  530 U.S. at 921 (quoting *Casey*, 505 U.S. at 870 (plurality opinion)) (emphasis added).**[10]**

Finally, the Supreme Court's most recent abortion decision, *Gonzales*, preserved the viability line as the limit on prohibitions of abortion, applying *Casey* rather than overturning it.  *Gonzales* left in place the earlier rulings that,

> *[b]efore viability*, a State 'may not prohibit any woman from making the ultimate decision to terminate her pregnancy.'  It also may not impose upon this right an undue burden, which exists if a regulation's 'purpose or effect is to place a substantial obstacle in the path of a woman seeking an abortion before the fetus attains viability.'

*Gonzales*, 550 U.S. at 146, 156 (emphasis added) (citation omitted) (quoting *Casey*, 505 U.S. at 878–79 (plurality opinion)).   From those premises, *Gonzales* went on to consider the constitutionality of the Partial-Birth Abortion Ban Act of 2003, 18 U.S.C. § 1531, framing the question before it as "whether the Act, measured by its text in this facial attack, imposes a substantial obstacle to late-term, but previability, abortions."  *Id.* at 156.

---

**[10]** Although the Court in *Stenberg* quoted from the plurality opinion in Part IV of *Casey*, the same principle is enunciated in Part I of the joint opinion, which is the opinion of the Court: "Before viability, the State's interests are not strong enough to support a prohibition of abortion or the imposition of a substantial obstacle to the woman's effective right to elect the procedure."  *Casey*, 505 U.S. at 846.

This court, similarly, has reaffirmed and applied the viability line in abortion cases.  In *Guam Society of Obstetricians & Gynecologists v. Ada*, 962 F.2d 1366 (9th Cir. 1992), we acknowledged that the core of *Roe*, including its holding that the state may not proscribe abortion before fetal viability, survived *Webster*.  *See id.* at 1372–74.  Because the challenged statute at issue in *Guam* criminalized abortions *prior to viability*, we held it unconstitutional.  *Id.* Both *Wasden* and *McCormack v. Hiedeman*, 694 F.3d 1004 (9th Cir. 2012), took as their starting points a woman's "Fourteenth Amendment right to terminate a pre-viability pregnancy."  *Wasden*, 376 F.3d at 921; *accord McCormack*, 694 F.3d at 1015, 1018 (enjoining enforcement of a statute that imposed a substantial obstacle to abortion of a nonviable fetus).[11]

Other federal courts have also emphasized the importance of the viability line when evaluating the constitutionality of state abortion laws.  For example, the Tenth Circuit struck down a ban on abortions after twenty weeks gestation because, by irrebuttably presuming viability at twenty weeks, the law prohibited the abortion of fetuses that may not be viable.  *See Jane L. v. Bangerter*, 102 F.3d 1112, 1115–18 (10th Cir. 1996).  The Sixth Circuit determined a state abortion law unconstitutional because it prohibited several of the most common *pre-viability* abortion methods, effectively precluding women from terminating their pregnancies before

---

[11] In addition to the enjoined statute, the plaintiff in *McCormack* also challenged another Idaho law, the Pain-Capable Unborn Child Protection Act ("the PUCPA").  Like the Arizona statute at issue here, the PUCPA bans abortions from twenty weeks gestational age.  *See McCormack*, 694 F.3d at 1009; Idaho Code §§ 18-505–18-507.  We did not reach the constitutionality of the ban, however, because the plaintiff lacked standing to challenge it.  *McCormack*, 694 F.3d at 1024–25.

fetal viability.  *See Northland Family Planning Clinic, Inc. v. Cox*, 487 F.3d 323, 337 (6th Cir. 2007).

As *Roe* and its many progeny make clear, viability, although not a fixed point, is the critical point.  The Supreme Court has recognized that viability varies among pregnancies and that improvements in medical technology will both push later in pregnancy the point at which abortion is safer than childbirth and advance earlier in gestation the point of fetal viability.  *See Casey*, 505 U.S. at 860.  Indeed, such trends led Justice O'Connor to remark, prior to *Casey*, that "the *Roe* framework . . . is on a collision course with itself."  *Akron*, 462 U.S. at 458 (O'Connor, J., dissenting).  But while "time has overtaken some of *Roe*'s factual assumptions," prompting the abandonment of the trimester framework, "no changes of fact have rendered viability more or less appropriate as the point at which the balance of interests tips."  *Casey*, 505 U.S. at 860–61.  Evolving medical realities have not eroded *Roe*'s central legal holding—that "viability marks the earliest point at which the State's interest in fetal life is constitutionally adequate to justify a legislative ban on nontherapeutic abortions."  *Id.* at 860.  *Casey* could not have been clearer when it stated:

> The soundness or unsoundness of that constitutional judgment in no sense turns on whether viability occurs at approximately 28 weeks, as was usual at the time of *Roe*, at 23 to 24 weeks, as it sometimes does today, or at some moment even slightly earlier in pregnancy, as it may if fetal respiratory capacity can somehow be enhanced in the future. *Whenever it may occur, the attainment of viability may continue to serve as the*

> *critical fact, just as it has done since* Roe *was decided.*

*Id.* (emphasis added).

While viability is a "flexible" point, *see Danforth*, 428 U.S. at 61, it is medically determinable, *id.* at 64–65. Precisely because viability varies from pregnancy to pregnancy, the Supreme Court has held repeatedly that "the determination of whether a particular fetus is viable is, and must be, a matter for the judgment of the responsible attending physician." *Colautti*, 439 U.S. at 396 (citing *Danforth*, 428 U.S. at 64). That is why a state may not fix viability at a specific point in pregnancy. *See Colautti*, 439 U.S. at 388–89; *Danforth*, 428 U.S. at 64–65. "[N]either the legislature nor the courts may proclaim one of the elements entering into the ascertainment of viability—be it weeks of gestation or fetal weight or any other single factor—as the determinant of when the State has a compelling interest in the life or health of the fetus." *Colautti*, 439 U.S. at 388–89; *see also McCormack*, 694 F.3d at 1014 n.5.

The parties here agree that no fetus is viable at twenty weeks gestational age. The district court so recognized, declaring it undisputed that viability usually occurs between twenty-three and twenty-four weeks gestation. Accordingly, Arizona's ban on abortion from twenty weeks necessarily prohibits pre-viability abortions. Section 7 is therefore, without more, invalid.

## III.

## A.

The district court justified its contrary conclusion by characterizing the challenged Arizona law as a regulation, rather than a prohibition, of pre-viability abortions. The court then reasoned that the statute does not impose an "undue burden," under the standard enunciated in *Casey* for determining the validity of rules regarding the manner in which pre-viability abortions are to be provided. *Casey* specified that a law imposes an undue burden on a woman's right to choose to terminate her pregnancy if it "has the *purpose or effect* of placing a substantial obstacle in the path of a woman seeking an abortion of a nonviable fetus." *Casey*, 505 U.S. at 877 (plurality opinion) (emphasis added); *see also Gonzales*, 550 U.S. at 156. Where it does so, the "power of the State reach[es] into the heart of the liberty protected by the Due Process Clause." *Casey*, 505 U.S. at 874 (plurality opinion). But this "undue burden"/ "substantial obstacle" mode of analysis has no place where, as here, the state is *forbidding* certain women from choosing pre-viability abortions rather than specifying the conditions under which such abortions are to be allowed.

Arizona's twenty-week law deprives women of the right to choose abortion at all after twenty weeks gestation. Given inaccuracies in calculating actual gestational age, the period between twenty weeks from the first day of a woman's last menstrual cycle and the point of fetal viability may be a month or more. *See* Amicus Brief of the Am. Coll. of Obstetricians & Gynecologists & Am. Cong. of Obstetricians & Gynecologists in Support of Plaintiffs-Appellants and Reversal at 4 n.4, *Isaacson v. Horne*, No. 12-16670 (9th Cir.

Sept. 13, 2012) ("ACOG Amicus Brief"). There is therefore no doubt that the twenty-week law operates as a ban on pre-viability abortion and that it cannot stand under the viability rule enunciated repeatedly by the Supreme Court, this circuit, and other circuits: "Before viability, a State may not prohibit any woman from making the ultimate decision to terminate her pregnancy." *Gonzales*, 550 U.S. at 146 (internal quotation marks omitted); *accord Casey*, 505 U.S. at 846.

Defendants and the district court rely most heavily on *Gonzales* for their contrary characterization of the Arizona law. But unlike the statute at issue in *Gonzales*, Section 7 does not just restrict a woman's right to choose a particular *method* of terminating her pregnancy before viability; it eliminates a woman's "right to choose abortion itself." *Stenberg*, 530 U.S. at 930. Even though the fetus is not yet viable at twenty weeks, only a physician can elect to perform an abortion from that point, and only in the case of a medical emergency as narrowly defined under the Arizona statute. During the period between the twenty-week mark and viability, the pregnant woman "lacks all choice in the matter" of whether to carry her pregnancy to term. *Casey*, 505 U.S. at 850. Under the Supreme Court's consistent holdings, that distinction makes all the difference to the validity of the Arizona statute.

This consequence—the elimination of a woman's choice as to post-twenty-week, pre-viability abortions—is not merely collateral to the Arizona law's purpose. Section 7 does not have only the "incidental effect of making it more difficult or more expensive to procure an abortion." *Id.* at 874 (plurality opinion). Nor does it merely "create a structural mechanism by which the State, or the parent or guardian of a minor, may express profound respect for the life

of the unborn." *Id.* at 877. Instead, the stated purpose of H.B. 2036 is to "[p]rohibit" a woman from electing abortion once the fetus reaches twenty weeks gestational age. H.B. 2036, sec. 9(B)(1). Given that Arizona law already forbids *post*-viability abortions, *see* Ariz. Rev. Stat. § 36-2301.01, the principal effect, and, necessarily, the primary intent, of the challenged statute is to prohibit *pre-viability* abortions at and after twenty weeks.

## B.

The district court nonetheless—again, erroneously, given the binding precedent we have surveyed—applied not the bright-line rule that the state may not proscribe abortion before viability, but instead the "undue burden" standard elaborated in *Casey* for quite different sorts of statutes. None of the factors on which the court rested its undue burden analysis—the continued availability of abortion prior to twenty weeks, the medical emergency exception in H.B. 2036, the rarity of abortion after twenty weeks, or the state's asserted interests in the law—can save a pre-viability *ban*, such as Arizona's twenty-week law, from constitutional infirmity.

## 1.

First, the district court held that, because a woman can obtain a pre-viability abortion *prior* to twenty weeks, the challenged law does not deprive her of the "ultimate decision" to terminate her pregnancy, but merely places a "time limitation" on that choice. The availability of abortions earlier in pregnancy does not, however, alter the nature of the burden that Section 7 imposes on a woman once her pregnancy is at or after twenty weeks but prior to viability.

And a prohibition on abortion at and after twenty weeks does not merely "encourage" women to make a decision regarding abortion earlier than Supreme Court cases require; it forces them to do so.

Under the twenty-week law, a woman who seeks to terminate her pregnancy must do so before twenty weeks gestational age or forfeit her right to choose whether to carry her pregnancy to term.  The Supreme Court has expressly rejected such attempts to "stretch the point of viability" earlier in pregnancy, or to peg it to a precise gestational date. *See Colautti*, 439 U.S. at 389; *Danforth*, 428 U.S. at 64. Under controlling Supreme Court precedent, a woman has a right to choose to terminate her pregnancy *at any point* before viability—not just before twenty weeks gestational age—and the State may not proscribe that choice.

**2.**

Second, the district court misconstrued the significance of the statute's medical emergency exception.  Because Section 7 incorporates an exception for medical emergencies, the district court concluded that it merely limits, rather than prohibits, pre-viability abortions from twenty weeks on.  But the law's emergency exception does not transform it from a ban into a limitation as to the mode or manner of conducting abortions.   Again, *Casey* is crystal clear on this point: "Regardless of whether exceptions are made for particular circumstances, a State may not prohibit *any woman* from making the ultimate decision to terminate her pregnancy before viability."   505 U.S. at 879 (plurality opinion) (emphasis added). As *Casey* instructs, even with a medical emergency exception, a proscription on a woman's *choice* to undergo an abortion remains invalid.  *Id.*   By permitting

abortions from twenty weeks to viability only at the decision of a medical professional as to an immediate medical necessity, Section 7 prohibits women from electing to terminate their pregnancies prior to fetal viability. *See id.* at 846 (joint opinion).

Moreover, to be constitutional, even laws that proscribe *post*-viability abortions, such as Arizona Revised Statutes § 36-2301.01, must contain a health exception. *See Roe*, 410 U.S. at 164–65; *Stenberg*, 530 U.S. at 930. "An adequate health exception . . . is a *per se* constitutional requirement. . . . To preclude a woman from receiving a medically necessary abortion is to impose an unconstitutional burden." *Wasden*, 376 F.3d at 922–23. As *Casey* put it, "the essential holding of *Roe* forbids a State to interfere with a woman's choice to undergo an abortion procedure if continuing her pregnancy would constitute a threat to her health." 505 U.S. at 880. Accordingly, the absence of an adequate medical exception may make an otherwise permissible prohibition on post-viability abortion unconstitutional. *See, e.g.*, *Stenberg*, 530 U.S. at 930. But the converse is not true: The presence of a medical exception does not make an otherwise impermissible prohibition constitutional. The adequacy of the medical exception has no bearing on whether the prohibition is permissible in the first place. The twenty-week law is unconstitutional because it bans abortion at a pre-viability stage of pregnancy; no health exception, no matter how broad, could save it.[12]

---

[12] The Physicians note that the language of the medical exception in the Arizona law, *see* Ariz. Rev. Stat. § 36-2151(6), parallels that upheld in *Casey*, where the concern was delay, not prohibition, of abortions, under a 24-hour waiting period and informed consent provision. *See Casey*, 505 U.S. at 879–81; *id.* at 885–87 (plurality opinion). The focus on

Because the medical emergency exception will not cover all women who seek pre-viability abortions at or after twenty weeks, the challenged provision continues to operate as a complete bar to the rights of some women to choose to terminate their pregnancies before the fetus is viable. Significantly, the emergency exception does not authorize abortions in cases of fetal anomaly or pregnancy failure, which do not pose an immediate threat to the woman's health. *See* Ariz. Rev. Stat. § 36-2151(6).

In sum, while a health exception is necessary to save an otherwise constitutional post-viability abortion ban from challenge, it cannot save an unconstitutional prohibition on the exercise of a woman's right to choose to terminate her pregnancy before viability.

**3.**

Nor does the district court's observation that pre-viability abortions at and after twenty weeks are relatively rare have any relevance to the law's constitutional validity. A prohibition's constitutionality is measured by its impact on those whom it affects, not by the number of people affected. *Casey* is lucid on this point as well: "The analysis does not end with the one percent of women upon whom the statute operates; it begins there. . . . The proper focus of constitutional inquiry is the group for whom the law is a

---

"immediate" danger in the current context, the Physicians contend, could require doctors to postpone abortions until medical risks pose an imminent threat to a pregnant woman's health, when the possibility of medical complications from abortion may be greater. Defendants dispute this understanding of the scope of the medical exception. As it is not relevant to our conclusion, we do not settle this disagreement concerning the precise implications of the statute's medical exception.

restriction, not the group for whom the law is irrelevant."
505 U.S. at 894.

**4.**

To the litany of justifications given by the district court
for failing to follow the Supreme Court's clear rule that no
woman may be entirely precluded from choosing to terminate
her pregnancy at any time prior to viability, Defendants add
one more: They argue that the twenty-week law "might be
constitutional based solely on the state's compelling interest
in maternal health." Current medical knowledge, Defendants
contend, indicates "abortion by 20 weeks has higher rates of
mortality and health complications for the mother than
carrying the unborn child to term." Consequently, they
reason, the state may proscribe abortions from twenty weeks
because "there is no right to *unsafe* abortion" (emphasis
added).

Once more, this suggestion runs squarely up against *Roe*
and its progeny, including *Casey*. Recognizing an important
state interest in maternal health, *Roe* held that "a State may
*regulate* the abortion procedure to the extent that the
regulation reasonably relates to the preservation and
protection of maternal health." 410 U.S. at 163 (emphasis
added). Toward this end, the Supreme Court has repeatedly
countenanced informed consent requirements directed at
protecting the health of pregnant women without precluding
a woman's ability to balance the risk to her own health, once
known, against other considerations.[13]    *See, e.g.*, *Casey*,

---

[13] The Physicians and *amici curiae* writing on their behalf contend that
medical evidence supports neither Defendants' assertions regarding the
relative risks of abortion nor Defendants' claims concerning fetal capacity

505 U.S. at 881–84 (plurality opinion); *Danforth*, 428 U.S. at 67. *Casey*, for example, upheld a requirement that doctors inform their patients of the consequences of abortion to their own health (as well as to the fetus). *See* 505 U.S. at 882–83 (plurality opinion). Just as for other medical procedures that carry risks of morbidity or mortality, the requirement upheld in *Casey* left women to decide, in consultation with their medical providers, whether they wish to undertake known risks.[14] Under the challenged Arizona law, however, if a pregnant woman is at or after twenty weeks gestation, she no longer can decide whether she is willing to undertake the risks to her own health posed by abortion; the State has made that choice for her.

Defendants correctly point out that the existence of medical or scientific uncertainty regarding either the safety of abortion after twenty weeks gestational age or fetal capacity

---

to experience pain from twenty weeks gestation. *See, e.g.*, ACOG Amicus Brief at 14–15 & nn.13–14 (arguing that abortion is safer than childbirth and that the Arizona legislature's findings address medical risks associated with abortion, not the relative risks of those procedures compared to childbirth); *see also McCormack*, 694 F.3d at 1016 n.8 (noting that numerous studies denounce any link between abortion and the pregnant woman's later mental health). Again, we do not consider which medical experts have the better of the disputes over the underlying medical facts regarding either the pregnant woman or the fetus, as our decision rests on binding legal principles.

[14] Notably, the Arizona Supreme Court has emphasized that, in the context of informed consent, "the decision to undergo an operation belongs to the patient." *Hales v. Pittman*, 118 Ariz. 305, 314 (1978). A more recent case, *Simat Corp. v. Arizona Health Care Cost Containment System*, recognized that the privacy clause of the Arizona Constitution guarantees Arizonans the right "to care for their health and to choose or refuse the treatment they deem best for themselves." 203 Ariz. 454, 458 n.2 (2002) (citing *Rasmussen v. Fleming*, 154 Ariz. 207, 215 (1987)).

to feel pain does not preclude the Arizona legislature from setting standards for the manner and means through which abortions are to be provided. *See Gonzales*, 550 U.S. at 163–64. Such uncertainty "does not foreclose the exercise of legislative power in the abortion context any more than it does in other contexts." *Id.* at 164. But neither does it expand legislative power beyond constitutional bounds.

The short of the matter is that, because Arizona's twenty-week law acts as a prohibition of, and not merely a limitation on the manner and means of, pre-viability abortions, under long-established Supreme Court law no state interest is strong enough to support it. *See Casey*, 505 U.S. at 846. Section 7 effectively shifts from viability to twenty weeks gestation the point at which the state's asserted interests override a woman's right to choose whether to carry a pregnancy to term. Supreme Court precedent does not countenance such a shift.

## IV.

Finally, we turn to a question to which the district court devoted considerable attention but which we conclude ultimately has no bearing on the outcome of the legal issue before us: whether the Physicians' suit is properly construed as a facial or as-applied challenge to the Arizona statute.

The Physicians maintain that they challenge the twenty-week law only as it applies to pre-viability abortions at or after twenty weeks gestation; they do not allege Section 7 is unconstitutional as applied to later-term abortions of viable fetuses, which none of the Physicians performs. Described in this fashion, the complaint appears to be "a paradigmatic as-applied attack [that] challenges only one of the rules in a

statute, a subset of the statute's applications, or the application of the statute to a specific factual circumstance." *Hoye v. City of Oakland*, 653 F.3d 835, 857 (9th Cir. 2011).[15] But as the district court observed, the twenty-week law only has practical significance under Arizona law until viability, because Arizona separately bans post-viability abortion under § 36-2301.01.  This lawsuit is not challenging the independent ban on post-viability abortions, and so, realistically, challenges Section 7 on its face—that is, in all the situations in which it would actually be determinative.

The precise characterization of the Physicians' complaint, however, has little bearing on the resolution of the legal question before us. "[T]he distinction between facial and as-applied challenges is not so well defined that it has some automatic effect or that it must always control the pleadings and disposition in every case involving a constitutional challenge."  *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 331 (2010).  Instead, the distinction matters primarily as to the remedy appropriate if a constitutional violation is found.  *Id.*  The substantive legal tests used in facial and as-applied challenges are "invariant," *Hoye*, 653 F.3d at 857, and so our question remains whether the

---

[15] That the statute has not yet been applied to any of the plaintiffs does not preclude them from bringing a pre-enforcement, as-applied challenge. Many such challenges have been entertained in the past. *See, e.g.*, *Casey*, 505 U.S. at 845; *Wasden*, 376 F.3d at 914; *Planned Parenthood of S. Ariz. v. LaWall*, 180 F.3d 1022, 1024–27 (9th Cir. 1999) (applying *Casey*'s "undue burden standard" in evaluating a facial challenge to an abortion regulation). Nor do the plaintiffs have an obligation, as the district court implied, to argue that the statute *would be* constitutional under some set of facts, but was "*only* unconstitutional as-applied to Plaintiffs."  If they can show that it is unconstitutional as to the patients on whose behalf they sue, then plaintiffs have met their burden for an as-applied challenge.

statute deprives a woman of the right to choose to terminate her pregnancy before viability. That it does so in all cases, or only in some cases to which it applies, may affect the breadth of the relief to which plaintiffs are entitled, but not our jurisdiction to entertain the suit or the constitutional standard we apply.

The posture of the challenge also can bear on the showing that plaintiffs must make to prevail. "Facial and as-applied challenges differ in *the extent to* which the invalidity of a statute need be demonstrated." *Legal Aid Servs. of Or. v. Legal Servs. Corp.*, 608 F.3d 1084, 1096 (9th Cir. 2010) (citation and internal quotation marks omitted). Here, however, there is no practical difference between the two approaches.

As we have discussed, given the controlling, substantive legal standards, Section 7 is invalid as applied to every woman affected by its prohibition on abortions. In other words, there is a one hundred percent correlation between those whom the statute affects and its constitutional invalidity as applied to them. That universal correlation is sufficient to require declaring the statute entirely invalid, even under the strict standard enunciated in *United States v. Salerno*, 481 U.S. 739 (1987), and applicable *except* in First Amendment and abortion cases, as there is "no set of circumstances" to which the statute applies under which it would be valid. *Id.* at 745. And, given the one hundred percent correlation, there is no doubt the special rule that applies to facial challenges in abortion cases—that plaintiffs need only show the law challenged is invalid "in a large fraction of the cases in which [the statute] is relevant," *Casey*, 505 U.S. at 895—is also met. *See also LaWall*, 180 F.3d at 1027.

In contrast, the facial versus as-applied distinction is relevant when a claimed statutory defect applies to a sub-category of the people affected by the law, and the court must determine whether that particular sub-category may challenge the statute as a whole, including its application to people who are not similarly situated. Here, because of the one hundred percent correlation, that usual concern with invalidating an abortion statute on its face—that the injunctive relief goes beyond the circumstances in which the statute is invalid to include situations in which it may not be—does not arise.

In *Gonzales*, for example, the Court considered whether the impact of the Partial-Birth Abortion Ban Act on people for whom the banned abortion method may be medically necessary was grounds to hold not only that the ban was unconstitutional as applied to those individuals, but that it was entirely unconstitutional and could not be applied at all because it lacked a medical exception. *See Gonzales*, 550 U.S. at 161–63. The Court concluded that an as-applied challenge was the proper vehicle through which to seek relief for the very small subgroup of affected women as to whom the absence of a medical exception might render the statute invalid. *See id.* at 167–68. Here, however, the substantive constitutional law renders the twenty-week law invalid as to every woman who would choose to have an abortion but is precluded from doing so by Section 7.

The Physicians are therefore entitled to the relief they seek, enjoining the challenged provision of Section 7 in its entirety.

**Conclusion**

Under controlling Supreme Court precedent, Arizona may not deprive a woman of the choice to terminate her pregnancy at any point prior to viability. Section 7 effects such a deprivation, by prohibiting abortion from twenty weeks gestational age through fetal viability. The twenty-week law is therefore unconstitutional under an unbroken stream of Supreme Court authority, beginning with *Roe* and ending with *Gonzales*. Arizona simply cannot proscribe a woman from choosing to obtain an abortion before the fetus is viable.

We therefore **REVERSE** the district court's denial of declaratory and injunctive relief.

---

KLEINFELD, Senior Circuit Judge, concurring:

The current state of the law compels me to concur.

Arizona defends the statute on two grounds: that the risk to pregnant women is considerably greater after 20 weeks gestation, and that fetuses feel pain at least by 20 weeks. The State has presented substantial medical evidence to support its legislative findings on both points. The very undeveloped record affords no basis for rejecting these propositions. But they do not suffice to justify the statute in the current state of constitutional law. Were the statute limited to protecting fetuses from unnecessary infliction of excruciating pain before their death, Arizona might regulate abortions at or after 20 weeks by requiring anesthetization of the fetuses about to be killed, much as it requires anesthetization of prisoners prior to killing them when the death penalty is

carried out.[1] *Gonzales v. Carhart* similarly suggested that if a particularly inhumane abortion procedure, removing the child from the uterus intact and then killing it after it had left the uterus and entered the vaginal canal, were "truly necessary in some circumstances, it appears likely an injection that kills the fetus is an alternative."[2]

The plaintiffs argue that some extremely serious birth defects cannot be detected until after 20 weeks. If that were all that were problematic about the statute, we could apply the doctrine of constitutional avoidance, and read the statutory phrasing to permit post-20 week abortions for serious fetal anomalies. "The elementary rule is that every reasonable construction must be resorted to, in order to save a statute from unconstitutionality."[3] The statutory phrase "serious risk of substantial and irreversible impairment of a major bodily function"[4] could, albeit with some strain, be read to mean impairment of the fetus's bodily functions. Even if not, birth of a severely deformed child is highly likely to impair all of a mother's bodily and mental functions for the rest of her life, because of the extraordinary burdens the child's disabilities and illnesses will likely cause a loving mother to suffer. A

---

[1] *See, e.g.*, *Dickens v. Brewer*, 631 F.3d 1139, 1142 (9th Cir. 2011) ("Arizona uses a three-drug lethal injection cocktail that consists of three chemicals—sodium thiopental, pancuronium bromide and potassium chloride—administered sequentially. Sodium thiopental is a fast-acting barbiturate that anesthetizes the inmate and permits the other chemicals to be administered without causing pain.").

[2] *Gonzales v. Carhart*, 550 U.S. 124, 164 (2007).

[3] *Id.* at 153 (quotations omitted).

[4] Ariz. Rev. Stat. § 36-2301.01 (C)(2).

hellish life of pain may be likely for both mother and child, in the case of the birth defects described in plaintiffs' affidavits.   A  prohibition  on  abortion  "would  be unconstitutional . . . if it subjected women to significant health risks."**5**

But plaintiffs do not limit their challenge to such cases, they just use them as emotionally appealing anecdotes for why abortions may be desirable after 20 weeks.  Because their challenge is facial, not an as-applied challenge involving specific birth defects, our decision cannot be based only on cases involving severe birth defects undetectable until the 20 to 23 week period.

The State argues that we ought to reject this facial challenge and await an as-applied challenge.  The State correctly argues that the challengers, in a facial challenge, must show that there can be "no set of circumstances . . . under which the Act would be valid."**6**  This is why plaintiffs are not entitled to prevail in this facial challenge case by showing that in some cases, such as the gross fetal deformity not detectable until after 20 weeks, the statute poses an "undue burden."

Because this is a facial challenge, we have to consider the opposite question, whether there can be any case in which the

---

**5** *Gonzales*, 550 U.S. at 161 (quotations omitted).

**6** *Id.* at 167 (quoting *Ohio v. Akron Center for Reproductive Health*, 497 U.S. 502, 514 (1990)). The Court in *Gonzales* notes, but does not resolve, the tension between the "no set of facts" standard in *Akron* and the "large fraction of the cases" standard in *Planned Parenthood v. Casey*, 505 U.S. 833 (1992).

burden is not "undue."  To do so, we must hypothesize cases in which the statutory "burden" on abortion might be less obviously troubling.  So let us suppose that the statute allows abortions on fetuses that are perfectly normal, as most are, and that the reason for the mother's decision to obtain a late abortion is that her partner, upon noticing her previously undisclosed pregnancy, pressures her to do so.  The question we must answer in this facial challenge case is whether a state may prohibit a post-20 week but previability abortion where the mother's choice results not from detection of a likely birth defect, not from health risks to the fetus or the mother, but from her decision made in the context of the ordinary pressures of life.  Such cases probably occur in substantial numbers, because ambivalence, moral strain, economic strain, and relationship strain may sometimes accompany pregnancy.

What controls this case is that the parties do not dispute that the 20-week line Arizona has drawn is three or four weeks prior to viability.  Defendants do not argue that the 20 to 23 or 24 week fetuses protected by the statute are viable, and offer no evidence to that effect.  We are bound, in this particular case, by the absence of any factual dispute as to whether the fetuses to be killed between gestational ages 20 and 23 or 24 weeks are viable.  The decision in this case cannot, of course, establish the factual medical question of whether they are viable, because non-viability is the underlying factual assumption of both parties in today's case.  For this case, Arizona concedes nonviability.

Viability   is   the   "critical   fact"   that   controls constitutionality.[7]   That is an odd rule, because viability changes as medicine changes.  As *Planned Parenthood v.*

---

[7] *Planned Parenthood v. Casey*, 505 U.S. 833, 860 (1992).

*Casey* noted, between *Roe v. Wade*[8] in 1973 and the time *Casey* was decided in 1992, viability dropped from 28 weeks to 23 or 24 weeks, because medical science became more effective at preserving the lives of premature babies.[9] The briefs make good arguments for why viability should not have the constitutional significance it does, but under controlling Supreme Court decisions, it does indeed have that significance. And even though medical science for premature babies may advance to where they are viable three or four weeks earlier, Arizona does not claim that science has done so.

Thus this case has to be decided on the assumption that the statute applies to non-viable fetuses, and that the statute before us prohibits abortions of non-viable fetuses past 20 weeks of gestation except for medical emergencies. We evaluate whether that prohibition is, under *Casey*, an "undue burden." The woman who does not have a "medical emergency" cannot obtain an abortion after 20 weeks from an Arizona physician. The question for us is whether the current state of constitutional law prohibits the states from imposing that restriction. It does.

Though *Casey* was a plurality opinion leaving some room for interpretation,[10] a majority of the Supreme Court in

---

[8] *Roe v. Wade*, 410 U.S. 113 (1973).

[9] *Casey*, 505 U.S. at 860.

[10] *Casey*, 505 U.S. 833.

*Gonzales* spoke clearly, albeit partially in dicta,[11] as to the current state of the law. Here are several propositions of law by which, under *Casey* and *Gonzales*, we are bound:

1. "[T]he government has a legitimate and substantial interest in preserving and promoting fetal life";[12]

2. "Before viability, the State's interests are not strong enough to support a prohibition of abortion or the imposition of a substantial obstacle";[13]

3. There is a constitutional "right of the woman to choose to have an abortion before viability and to obtain it without undue interference from the State";[14]

4. "*Casey* rejected both *Roe*'s rigid trimester framework and the interpretation of *Roe* that considered all previability regulations of abortion unwarranted";[15]

---

[11] *U.S. v. Montero-Camargo*, 208 F.3d 1122, 1132 n.17 (9th Cir. 2000) ("We do not treat considered dicta from the Supreme Court lightly. Rather, we accord it appropriate deference. . . . Supreme Court dicta have a weight that is greater than ordinary judicial dicta as prophecy of what that Court might hold; accordingly, we do not blandly shrug them off because they were not a holding.") (quotations omitted).

[12] *Gonzales*, 550 U.S. at 145.

[13] *Id.* (quotations omitted).

[14] *Id.*

[15] *Id.* at 146.

5. "Before viability, a State may not prohibit any woman from making the ultimate decision to terminate her pregnancy";[16]

6. An "undue burden," prohibited by *Casey* even though less than an absolute prohibition, exists if a "regulation's purpose or effect is to place a substantial obstacle in the path of a woman seeking an abortion before the fetus attains viability";[17]

7. *Gonzales* accepts as appropriate government objectives prohibiting inhumane procedures that "coarsen society," recognizing that a government may consider "effects on the medical community," and "may use its voice and its regulatory authority to show its profound respect for the life within the woman";[18]

8. The "undue burden" test does not prohibit laws that have a valid purpose but an "incidental effect of making [abortion] more difficult or expensive to procure,"[19] and the woman seeking to abort even a previability fetus is not constitutionally entitled to do so completely free of interference from the state, but any state interference cannot be "undue."[20]

---

[16] *Id.* (quotations omitted).

[17] *Id.*

[18] *Id.* at 157.

[19] *Id.* at 158 (quotations omitted).

[20] *Id.* at 145 (quotations omitted).

Our circuit law is to similar effect, of course.[21]

Arizona has unquestionably put a "substantial obstacle" in the path of a woman seeking to abort a previability fetus. Unless she has a "medical emergency," no one can perform it on her. True, she might be able to go to another state for it, but I am unaware of any case in which one state may deprive someone of a constitutional right because the individual could exercise it in another state. And aborting previability fetuses is, under the current state of the law, a constitutional right. True, the state has a legitimate interest in protecting the fetus from pain. Although plaintiffs' amici claim that a previability fetus feels no pain, the state's experts' affidavits claim that it does, and legislatures have "wide discretion to pass legislation in areas where there is medical and scientific uncertainty."[22] But protection of the fetus from pain, even the pain of having a doctor stick scissors in the back of its head and then having the doctor "open[] up the scissors [and stick in] a high-powered suction tube into the opening, and suck[] the baby's brains out" was not enough in *Gonzales* to justify a complete prohibition.[23]

As for Arizona's claimed interest in the mother's health, people are free to do many things risky to their health, such as surgery to improve their quality of life but unnecessary to preserve life. There appears to be no authority for making an

---

[21] *See McCormack v. Hiedeman*, 694 F.3d 1004 (9th Cir. 2012); *Planned Parenthood of Idaho, Inc. v. Wasden*, 376 F.3d 908 (9th Cir. 2004).

[22] *Gonzales*, 550 U.S. at 163.

[23] *Id.* at 139.

exception to this general liberty regarding one's own health for abortion.

I have alluded to administration of the death penalty to convicts because in one respect it is analogous. Many people have very substantial moral, philosophical, practical, and religious objections to one or both. Of course the analogy is limited, because convicts sentenced to death have committed horrendous crimes, but fetuses have committed no crimes. But the analogy applies to the extent that regardless of the objections we may have, a lower court is bound to apply Supreme Court authority, which allows executions and requires states to permit abortions. And under the authority by which we, and the state legislatures, are bound, the Arizona prohibition is unconstitutional.